**RYKO MANUFACTURING CO., Appellant,**

v.

**EDEN SERVICES, a Maryland Partnership, Fred J. Eden, Jr. and J. Erik Eden, Appellees.**

**EDEN SERVICES, Fred J. Eden, Jr. and J. Erik Eden, Appellees,**

v.

**RYKO MANUFACTURING CO., Appellant.**

**RYKO MANUFACTURING CO., Appellee,**

v.

**EDEN SERVICES, a Maryland Partnership, Fred J. Eden and J. Erik Eden, Appellants.**

**EDEN SERVICES, Fred J. Eden, Jr. and J. Erik Eden, Appellants,**

v.

**RYKO MANUFACTURING CO., Appellee.**

Nos. 86–1312, 86–1393.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 13, 1986.

Decided June 29, 1987.

Rehearing and Rehearing En Banc Denied Aug. 18, 1987.

See also 759 F.2d 671.

Donald J. Polden, Des Moines, Iowa, for appellant.

David O. Stewart, Washington, D.C., for appellees.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

Ryko Manufacturing Company (Ryko) appeals from the District Court's denial of its motions for directed verdict, judgment notwithstanding the verdict, and a new trial, following a jury trial of various claims stemming from a dispute with one of its distributors, Eden Services (Eden). Ryko initiated this lawsuit, seeking a declaratory judgment that Eden had breached the terms of its distributorship contract with Ryko. Eden counterclaimed, charging Ryko with federal antitrust and racketeering violations, breach of contract, and common law fraud. Eden later dropped its racketeering claim, but after a protracted trial, the jury returned verdicts for Eden on the antitrust, contract, and fraud claims. The jury awarded Eden damages only on the antitrust claims, which, when trebled, totalled approximately $1.1 million. Ryko challenges each of the verdicts, arguing that Eden has not produced evidence sufficient to support any of its claims. Alternatively, Ryko challenges the District Court's rulings on evidentiary matters pertaining to the computation of damages with respect to Eden's antitrust claims.

## FACTUAL BACKGROUND

Ryko is a manufacturer of automatic car-wash equipment. Ryko markets its products nationally, both through a network of distributors and by direct sales to larger purchasers such as major oil companies arranging for the purchase of car-wash equipment for their affiliated stations. In the past Ryko has granted its distributors exclusive geographic territories and has prohibited the distributors from selling competitive car-wash equipment. Although the newer contracts contain less restrictive provisions, Eden's distributorship contract includes the earlier, more restrictive provisions. The distributors are responsible for promoting and soliciting sales of Ryko equipment and for performing installation, maintenance, and repair work on machines sold in their exclusive territories. In some areas, Ryko is a direct

distributor and subcontracts the installation, maintenance, and repair work.

Sales of car-wash units are made in two ways, by sight draft and by purchase order. In sight-draft sales, the distributor takes an order for the equipment from the purchaser and forwards the purchase order to Ryko along with a downpayment on the machine. Ryko then builds the equipment as ordered, and ships the equipment to a location specified on the distributor's purchase order. Before the equipment is unloaded at its destination, Ryko requires confirmation that the distributor's sight draft, which guarantees payment for the equipment, has been honored. In all material respects, these sales are thus the equivalent of cash transactions. Ryko provides its distributors with suggested retail prices for its equipment, but the distributors are free to charge whatever the market will bear when selling by sight draft to independent buyers unaffiliated with any of the major oil companies or other major buyers.

For sales by purchase order, Ryko requires no downpayment. The customer issues a purchase order in its own name payable directly to Ryko, and this documentation is intended to exclude the distributor as an intermediate payor or payee. Ryko then ships the equipment to the customer and arranges for its installation by a distributor, without requiring immediate payment.

Sales to larger customers generally are made by purchase order through Ryko's National Account Program (NAP). Under the NAP, designated customers, most commonly major oil companies and other multiple purchasers of car-wash equipment, receive significant volume discounts from the prices that Ryko recommends its distributors charge on individual sales for the distributor's own account. Ryko's contracts with its distributors specify that Ryko retains sole control over pricing and other marketing decisions regarding the NAP.

Although the qualifications for NAP customer status are not entirely clear, Ryko appears to focus its NAP program on those customers who are likely to purchase a large number of car-wash machines and whose buying decisions are handled, at least initially, in some centralized manner. For example, the oil companies generally participate in the purchase of car-wash equipment by their affiliated service stations. In many cases, prior approval of the equipment by the oil company is necessary because the oil company is assisting the station owner or jobber with financing for the machines. Even where financial assistance from the oil company is not required, lease obligations or other contractual arrangements may require such approval before installation of equipment at a particular service station. Accordingly, very few of the individual station operators or jobbers affiliated with the major oil companies are likely to purchase equipment unless it first has been approved by central management. The oil companies naturally seek to use their potential for purchasing large quantities of machines, even if purchased one at a time, to demand the best possible prices and service arrangements from their equipment suppliers. Moreover, the oil companies generally expect to receive a single discounted price for equipment to be installed at any company location throughout the country. Joint Appendix (J.A.) 359; Trial Exhibits (Ex.) 23, 72, 81, 83, 87, 88, B–2, I–3.

In many respects, sales by the distributors and NAP sales are identical. The distributor often is involved in the NAP sale and frequently is responsible for promotion, planning, installation, and servicing of equipment sold to NAP customers. However, Ryko corporate sales personnel are involved to a greater degree in NAP sales than in the distributors' sales to non-NAP customers. Ryko makes sales presentations to oil company procurement personnel, arranges for installatior of Ryko equipment on a trial-use basis, and negotiates volume discounts with the customers in an effort to receive the required oil company approvals for its equipment. Ryko's factory representatives maintain continuing contact with the NAP customers' national or regional headquarters, further promoting the products and monitor-

ing customer satisfaction with the equipment and services.

Although some companies issue orders for multiple machines based on these national presentations, the distributors' promotional efforts can be essential to the completion of individual NAP sales. The distributors make primary contact with (1) individual station owners affiliated with the major oil companies; (2) oil industry middlemen, known as "jobbers," who typically own a number of affiliated stations; and (3) middle level or district managers of the oil companies with direct responsibility for retailing operations within the distributors' areas. While an oil company might designate Ryko an approved equipment supplier as the result of a national sales presentation, many NAP sales cannot be completed until the distributor has convinced the local purchaser that installing Ryko car-wash equipment at his location is a profitable idea.

Nevertheless, there are important differences between NAP sales and other sales by the distributors. First, as noted above, the prices at which NAP sales are made are set by Ryko. In making a sales presentation under the NAP, the distributor is obliged to offer equipment at the NAP price. Sales by the distributors for their own accounts are not similarly restricted. Second, the method of payment differs. In the case of NAP sales, Ryko extends credit to the customer, shipping and arranging for installation of the goods solely on the basis of the customer's purchase order. On other sales, Ryko requires its distributors to issue sight drafts guaranteeing immediate payment for the machines. Third, the method of compensating the distributors differs. On sight-draft sales, the distributor receives payment directly from the customer, and earns a gross profit equal to the difference between the retail price he charges the customer and the wholesale price Ryko charges the distributor for the machine. On NAP sales, Ryko pays the distributors a commission for each machine sold in the distributor's exclusive territory. The commission on NAP sales is the difference between the NAP price to the customer and the wholesale price the distributor would have paid if purchasing the machine for its own account. Finally, the documentation for the transactions differs. The same purchase order forms, which bear Ryko's logo and billing address, are used in both sight-draft and NAP sales. However, the distributors are required by their contracts with Ryko to issue purchase orders for NAP sales in the name of the NAP customer; on sales for the distributor's own account, the orders are issued in the distributor's name.

Eden became a Ryko distributor in the summer of 1977 and was assigned in the distributorship contract an exclusive territory covering Maryland and the District of Columbia. Ryko recently had assigned all of Virginia to another distributor, but Eden repeatedly expressed a desire to distribute Ryko's products in the northern Virginia area near Washington, D.C. The precise nature of Ryko's assurances to Eden on this issue are a subject of sharp dispute between the parties. However, it is clear that Eden reached an agreement with the Virginia distributor regarding a division of commissions on sales in northern Virginia and that Eden actively promoted and sold Ryko's products there.

In 1980, Ryko terminated its Virginia distributor, and again the issue of Eden's territory arose. Eden claims that a Ryko factory representative assured it that its agreement with the former Virginia distributor would be honored; Ryko claims that the agreement allowed Eden to perform services in Virginia only on an "as needed" basis for Ryko. The dispute over Eden's territory and commissions continued into 1982, and business relations became increasingly strained. In April 1982 the parties met and came to an agreement regarding Eden's rights in northern Virginia, but both parties agree that the agreement was not adhered to. Whether the agreement effectively modified the distributorship contract and whether one or both of the parties breached the modified agreement are disputed. Following the April meeting, relations continued to deteriorate. Eden accused Ryko of unilaterally depriving the distributors of their customers by adopting

a new "special usage" account as part of the NAP. Eden shared its views with other Ryko distributors, and Ryko accused Eden of taking a "cheap shot" at Ryko.

In October 1982, Ryko informed Eden that it was returning to the literal terms of the 1977 contract, since Eden had refused to sign the new distributorship contracts offered in 1980 and 1982 and since, in Ryko's view, Eden had not adhered to the terms of the April 1982 agreement. Under Ryko's interpretation of the 1977 contract, Eden categorically was barred from distributing Ryko products in Virginia and was subject to a pricing structure that differed from the other distributors, who operated under newer contracts with different pricing provisions. Ryko also read the contract to prohibit Eden from selling a water reclaim device (used to recycle water used in car-wash systems) developed by Eden, and directed Eden to sell only Ryko water reclaim units.

Eden wrote letters to Ryko in December 1982 and January 1983 accusing Ryko of harassing Eden, of taking over its territories, and of interfering in Eden's business relationships. Eden asserted its right to sell in Virginia as it saw fit and threatened legal action against Ryko if necessary. Both parties continued to make demands of the other regarding proposed contract changes, but by this time communication had become more conducive to litigation than to resolving a business dispute.

Following Eden's February 1983 bid to Crown McClean, a Virginia customer Eden had pursued for several years, Ryko brought its declaratory judgment action in District Court, which prompted Eden's extensive counterclaims. In December 1983 Ryko attempted to terminate Eden, citing alleged interference with Ryko's contractual relationships with both its customers and its distributors and Eden's alleged sale of competing products in violation of the exclusive dealing provision of the distributorship agreement. Eden sought and received an injunction against the termination and

an order defining its rights in northern Virginia. Ryko appealed the order, and this Court modified the injunction in April 1985. *Ryko Mfg. Co. v. Eden Services,* 759 F.2d 671 (8th Cir.1985). The subsequent District Court trial on Eden's various common law and antitrust counterclaims resulted in multiple verdicts and a substantial damages award for Eden. Ryko made motions for a new trial and for judgment notwithstanding the verdict, which the District Court denied in most substantive respects.[1] Final judgment having been entered in favor of Eden, Ryko appeals the District Court's ruling on its post-trial motions, and the parties are again before us. Ryko contends that there is insufficient evidence to support any of the jury verdicts and, accordingly, that the District Court erred in denying its motion for judgment notwithstanding the verdict. Alternatively, Ryko argues that the verdicts are against the weight of the evidence, and that the District Court erred in denying its motion for a new trial.

## STANDARDS OF REVIEW

When reviewing a district court's ruling on a motion for judgment notwithstanding the verdict, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Pumps & Power Co. v. Southern States Industries,* 787 F.2d 1252, 1258 (8th Cir.1986). This requires us to

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tends to prove, (3) give the nonmovant the benefit of all reasonable inferences and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*McCabe's Furniture v. La-Z-Boy Chair Co.,* 798 F.2d 323, 327 (8th Cir.1986).

Our review of a district court's denial of a motion for a new trial is even more limited. The denial of a motion for a new trial is within the sound discretion of the

---

1. The jury appeared to have derived one of the damage awards from the wrong damages exhibit, and the District Court reduced this award to reflect the correct amount. Eden did not resist Ryko's j.n.o.v. motion with respect to the attempted monopolization claim. J.A. 799.

trial court, and its ruling will be reversed only upon a showing that the court abused its discretion. *Greenwood v. Dittmer,* 776 F.2d 785, 790 (8th Cir.1985); *see also Craft v. Metromedia, Inc.,* 766 F.2d 1205, 1221 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986). We have thoroughly examined the extensive record, and we apply these standards, as appropriate, to each of the verdicts rendered against Ryko.

## ANTITRUST: Resale Price Maintenance

■ Ryko's first argument on appeal is that the evidence was insufficient to submit Eden's resale price maintenance claim to a jury. Resale price maintenance, a form of vertical price fixing by which a seller of goods attempts to set the price at which his buyer resells the goods to a second buyer, has been condemned as inevitably tending to have a pernicious effect on competition. *See, e.g., Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 351, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1982). As a result, resale price maintenance is subject to a rule of *per se* illegality under Section 1 et seq. of the Sherman Act, 15 U.S.C. § 1 et seq. *Continental T.V., Inc. v. GTE Sylvania,* 433 U.S. 36, 51 n. 18, 97 S.Ct. 2549, 2558 n. 18, 53 L.Ed.2d 568 (1977). Schemes to fix both minimum, *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), and maximum resale prices, *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), are subject to the rule, and no evidence of anticompetitive impact is required to prove a violation. Despite criticism regarding the theoretical justification for the *per se* treatment of vertical price restrictions, *see, e.g., Sylvania,* 433 U.S. at 69–70, 97 S.Ct. at 2567–68 (White, J., concurring in judgment); Bork, *The Antitrust Paradox* 282–98 (1978), the Supreme Court recently has declined to reconsider the wisdom of the rule as it applies to resale price maintenance. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 761 n. 7, 104 S.Ct. 1464, 1469 n. 7, 79 L.Ed.2d 775 (1984).

It follows that if, as Eden claims, Ryko's NAP is a resale price maintenance scheme, we would not be free to consider its actual effect on interbrand competition. However, we hold that Eden's evidence in this case is insufficient as a matter of law to establish that the NAP constitutes resale price maintenance.

Ryko designed the NAP to operate within its existing framework of independent distributors, because it had neither the desire nor the capital to establish a vertically integrated distribution network on a national scale. It is undisputed that without a comprehensive national sales approach, including standardized price quotations, Ryko would find it difficult, if not impossible, to obtain the required oil company approvals of its equipment. If the pricing system and purchasing mechanisms of Ryko's NAP are held to constitute resale price maintenance, the practical effect of such a holding will be to require direct distribution of car-wash equipment sold to major oil companies. This would pose a potentially insurmountable barrier—in terms of the required capital and labor—to the entry of new competitors. Such a result hardly would be consistent with sound antitrust policy.

■ As observed recently by the Seventh Circuit, "[i]t is not the law that if someone hires a real estate broker to sell his house for $100,000 he and the broker have made an agreement to fix the resale price of the house and are therefore guilty of a per se violation of the Sherman Act...." *Morrison,* 797 F.2d at 1436. Whether expressed in terms of an agent's incapacity to engage in an antitrust conspiracy with his corporate principal, *see, e.g., Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313, 1316–18 (8th Cir.1986), or in terms of a direct sale between the antitrust defendant and the purchaser (in which case there is no resale by the distributor), *see, e.g., Overhead Door Corp. v. Nordpal Corp.,* 1979–1 Trade Cas. (CCH) ¶ 62,595 (D.Minn.1978), the analysis is essentially the same. To establish a case of resale price maintenance by a manufacturer, the antitrust plaintiff must demonstrate that (1) the manufacturer has contracted, combined, or conspired (2) with a separate economic entity (3) to set the price at which

the products are resold (4) in an independent commercial transaction with a subsequent purchaser. We find that as a matter of law Eden acts as Ryko's agent, for antitrust purposes, in those sales in which Ryko sets the retail price of its machines. Accordingly, we hold that Eden failed to present a submissible case for the jury on its claim of resale price maintenance.

In *United States v. General Electric Co.*, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), the Supreme Court held that a manufacturer could, without incurring liability for vertical price fixing, sell merchandise directly to the consumer through a network of distributors acting as sales agents of the manufacturer. General Electric employed a consignment plan whereby the company fixed the price of incandescent lamps sold by retailers to the public. The Court held that by means of a "genuine contract[ ] of agency," a manufacturer lawfully could "dispose of his article directly to the consumer and fix[ ] the price by which his agents transfer the title from him directly to such consumer." *Id.* at 488, 47 S.Ct. at 196.

Almost forty years later, in *Simpson v. Union Oil Co.*, 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964), the Court considered a similar consignment system employed by a number of the major oil companies. Union Oil Company sold gasoline nationally through over three thousand retail service stations. The company delivered gasoline on consignment to station operators, who sold it at prices determined by Union. Although Union retained title to the gasoline until it was sold at the pump, the operator was "responsible for all losses of the 'consigned' gasoline in his possession, save for specified acts of God." *Id.* at 15, 84 S.Ct. at 1053. This time, the Court was less sympathetic, holding that the consignment device was a mere sham that served to cover a vast gasoline distribution system that involved illegally fixing resale prices. *Id.* at 21, 84 S.Ct. at 1057. The Court concluded that a supplier could not, "by clever manipulation of words," restrain price competition between otherwise independent retail distributors. *Id.* at 22, 84 S.Ct. at 1057.

*Simpson* does not mean that legitimate agency or consignment arrangements can give rise to antitrust liability. "[A]n owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner," *id.* at 21, 84 S.Ct. at 1057, because a sales agent, when acting within the scope of his agency, is incapable of engaging in an antitrust conspiracy with his corporate principal. *Pink Supply*, 788 F.2d at 1316; *Calculators Hawaii, Inc. v. Brandt, Inc.*, 724 F.2d 1332, 1336 & n. 1 (9th Cir.1983). *Simpson* thus did not overrule *General Electric*. *See Pogue v. International Industries, Inc.*, 524 F.2d 342, 345 (6th Cir.1975). Rather, the Court limited the scope of its prior decision, and refined the courts' inquiry in evaluating similar agency claims.

Under *Simpson* we are directed to examine the various substantive "indicia of entrepreneur[ship]" and the allocation of business risks, rather than the mere form of the agreement, in evaluating the economic substance of an agency or consignment. 377 U.S. at 20, 84 S.Ct. at 1056. If a distributor deals with his supplier as an "independent businessman" who bears most or all of the risks on transactions with purchasers, then an agency or consignment agreement is ineffective to insulate the manufacturer from antitrust liability for fixing resale prices. *Id.* at 20–21, 84 S.Ct. at 1056–57; *Greene v. General Foods Corp.*, 517 F.2d 635, 652–53 (5th Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976). However, where the manufacturer bears the financial risks of transactions with the customers and continues to retain "title, dominion and control over its goods," *Pogue*, 524 F.2d at 345, then it is likely that the distributor is merely an agent for the manufacturer. *See also Mesirow v. Pepperidge Farm, Inc.*, 703 F.2d 339, 342–43 (9th Cir.) (no resale price maintenance where defendant bore "significantly greater risks" in sales of goods through plaintiff distributors), *cert. denied*, 464 U.S. 820, 104 S.Ct. 83, 78 L.Ed.2d 93 (1983).

This analysis is limited to examining the distributor's role vis-a-vis transactions al-

legedly involving an antitrust violation. A distributor may act as his supplier's agent when performing certain duties in a business relationship, but as an independent entrepreneur when performing others. Hence, in *Hardwick v. Nu-Way Oil Co.*, 589 F.2d 806, 809–10 (5th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979), the operator of a drive-in convenience store and gas station was held to be a sales agent of the defendant when making sales of gasoline, although she was an independent entrepreneur when making grocery sales. The court noted that the operator bore none of the financial risks of the gasoline sales, *id.* at 810–11, and concluded that the operator "was, for purposes of the antitrust laws, operating a company station as an employee." *Id.* at 809. The court held that the economic substance of the relationship more closely resembled an agency, even though "the agreement [between the operator and the defendant] itself provided that the station operator was to be considered an independent contractor." *Id.* at 809, 811.

Here, as in *Hardwick*, our focus is not on Eden's entire business relationship with Ryko. Rather, we are concerned with Eden's role in sales for which Ryko fixed the price charged the purchaser of the equipment. Eden's role as agent or entrepreneur in making non-NAP sales, in which Eden is free to charge whatever the market will bear, therefore is irrelevant to our analysis of the resale price maintenance claim. Similarly, we are bound neither by Eden's nor Ryko's characterization of the distributorship relationship, nor by language in the distributorship contract disclaiming that Eden acts as Ryko's agent "for any purposes whatsoever." *Simpson* directs us to decide Eden's role based on the substance of the economic relationship, and not exclusively on the terms that the parties used to characterize Eden's role. 377 U.S. at 21–22, 84 S.Ct. at 1056–57; *see also Illinois Corporate Travel, Inc. v. American Airlines, Inc.*, 806 F.2d 722, 725–26 (7th Cir.1986) (agency determined by reference to objective factors, rather than to parties' subjective intent).

We must examine Eden's role and the types of business risks it bears in two types of transactions involving NAP-designated customers: (1) sales by purchase order and (2) sales by sight draft. The parties agree that transactions of the first type are covered by the NAP and are subject to the program's pricing structure. Regarding the second type of transaction, there is disagreement. Eden argues that these sales to NAP-designated customers also were covered by the NAP, and accordingly were subject to Ryko's price controls. Ryko disputes this, contending that no sight-draft sales, including those to NAP-designated customers, were subject to NAP pricing policies.[2] We consider each type of transaction in turn.

**Purchase Order Sales**

We have no difficulty in deciding that, as a matter of law, Eden failed to produce sufficient evidence from which a jury reasonably could conclude that Eden acts as a separate business entity, independently bearing economic risks of independent commercial transactions in soliciting purchase order sales under the NAP. In both substance and form, Eden acts as Ryko's agent in effecting purchase order sales between Ryko and the NAP customers, and Ryko therefore cannot be held liable for fixing the price of equipment so sold.

Eden repeatedly refers us to *Greene v. General Foods Corp.*, 517 F.2d 635 (5th Cir.1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976), urging that its business relationship with Ryko closely resembles the arrangement held to constitute resale price maintenance in that case. We are not persuaded that the similarities are sufficient to compel the same result here. In *Greene*, General Foods employed a similarly bifurcated program of both direct and national account sales to

---

**2.** Sight-draft sales to non-NAP designated customers clearly fall outside the NAP pricing structure. Eden was free to charge whatever price the market would bear on these types of transactions, and they therefore are irrelevant to our analysis of the resale price maintenance claim.

service the entire market for its coffee products. *Id.* at 640. Distributors were free to charge any price for direct sales to ordinary customers, but sales to national account customers were priced according to a schedule set by General Foods. *Id.* at 640–41. The distributor in *Greene* "held title to all goods he acquired from General Foods," took possession of the goods, and "stored them in his warehouses at his own expense and at his risk of loss." *Id.* at 641. Deliveries for both direct and national account sales were made from the distributor's own stocks, and the distributor was responsible for billing national account purchasers, using invoices written in the name of General Foods. *Id.*

In contrast, Eden never took possession of Ryko machines sold under purchase order, nor did it bear any of the responsibility for billing the NAP purchasers. Eden merely filed the purchase order with Ryko and received its commission after Ryko collected on the account. Unlike General Foods, Ryko never parted with title, dominion, or control over the machines before passing them to the NAP customer. Eden's distributorship contract specifies that purchase orders for machines ordered under the NAP are to be issued in Ryko's name and not Eden's.[3] Ryko bears all the credit risks in the transactions and performs its own billing on NAP purchase order sales. Where required, Ryko secures the necessary electrical approvals, engineering inspections, and government operating permits for its equipment. Ex. 5, 38, P–3; Tr. 864–67. *Compare Hardwick,* 589 F.2d at 810 (defendant acquired and maintained all necessary permits). Eden occasionally was involved in securing such approvals, but only to the extent necessary to have its own water reclaim system approved for use in connection with a Ryko car wash. Ex. B–3, Q–3.

Because the machines are never in Eden's possession, Eden bears none of the risks attendant to warehousing them prior to sale. Although Ryko requires its distributors to make minor repairs on machines damaged in transit,[4] the distributors may make claims against the carriers for repair expenses so incurred. While satisfactory resolution of these shipping damage claims is not always forthcoming, such obligations do not, without more, constitute a meaningful shifting of the risk of loss on purchase order transactions.

Eden repeatedly attempts to characterize NAP customers as its own, apparently relying on language from *Greene* regarding the distributors' sales efforts in that case.[5]

3. This is more than a mere paper formality; Ryko uses the NAP purchase order as collateral for operational financing, relying on the creditworthiness of the major oil company buyers to secure loans approaching the face value of the purchase orders. Tr. 453.

4. Ryko ships goods sold under the NAP in the name of the purchaser, FOB Des Moines, which means that the ultimate purchaser, rather than Eden, is legally responsible for the goods during shipment. *See* Iowa Code §§ 554.2319, 554.2401, 554.2509. However, Eden demonstrated that in practice Ryko requires its distributors to take responsibility for minor shipping damage. *See, e.g.,* Ex. R–4, U–4, Tr. 1446–49. Similarly, although the distributorship contract requires Eden to maintain liability insurance covering the machines and Eden's installation and service work, Eden admitted that Ryko has not strictly enforced the provision. Tr. 1109. Moreover, it is unclear whether Eden could be held legally responsible for damage caused by a machine to which Eden never holds title, and Eden has presented no evidence that it actually purchased the insurance coverage.

5. In *Greene,* the court suggested that one of the central issues in applying *Simpson* to the facts of that case was to decide "who was a customer of whom." 517 F.2d at 655. Indeed, the District Court here submitted the *Simpson* inquiry to the jury in exactly the same terms. Jury Instruction 19. Ryko has not objected to the form of this instruction, and because of our view of the evidence, we need not decide whether the instruction constitutes plain error. However, we note that the instruction seriously misstates the law and would be grounds for reversal if Ryko had objected to the form and content of the instruction, rather than relying solely on its objections regarding the sufficiency of the evidence. *Simpson* clearly directs our attention to the economic risks involved in the transactions, not to an ambiguous inquiry regarding the loyalties of the ultimate consumer. To instruct a jury to conduct a *Simpson* inquiry by deciding whose customers belong to whom is to invite the jury to speculate about personal relationships between the parties, and to draw conclusions based solely on evidence regarding promotional efforts, rather than on the actual assumption of economic risk. A jury reasonably

In *Greene*, General Foods apparently performed none of the solicitation and promotion of the national account customers and products. 517 F.2d at 657–58. At trial, Eden asserted that Ryko similarly had no significant relationship with NAP customers and no involvement in most NAP sales. The evidence flatly contradicts such an assertion. Eden's contact with oil company district managers and individual station operators clearly gives it closer personal contact with individuals at the local level. However, Ryko submitted uncontradicted evidence demonstrating that it promotes and submits bids on equipment directly to NAP customers and that it has received orders for purchases of machines from the customers so solicited. *Cf. Mesirow*, 703 F.2d at 343 (defendant promoted and serviced direct-billed accounts).

Testimony from a local franchisee of one of the national accounts—that he had no real relationship with Ryko's central management—is not a sufficient basis for the inference that Eden was solely responsible for NAP sales in its territory. Eden has demonstrated that its sales efforts are in some cases necessary, but it has not proved that they are ever sufficient to make sales to NAP customers. The situation here, where selling responsibility is divided among Ryko's central management, its regional sales representatives, and its local distributors, is far different from the situation in *Greene*, where "the actual 'selling'—the solicitation of orders, the moving of merchandise, most of the risk of loss, and the day-to-day task of creating and maintaining customer satisfaction—[was] performed by Greene ... and not by some central selling staff of General Foods." *Greene*, 517 F.2d at 657–58. Where the evidence shows that the distributor is not solely responsible for making the sales, we believe the distributor must produce more substantial evidence of its independence under *Simpson* to justify submitting a re-

sale price maintenance claim to a jury. *Cf. Overhead Door Corp.*, 1979–1 Trade Cas. (CCH) ¶ 62,595, at 77,431 (evidentiary burden greater where defendant participates in sales efforts to national customers and where plaintiff can set prices for sales on his own account).

We are unpersuaded that Eden's selling efforts to NAP customers would satisfy the *Simpson* test even if Ryko were not jointly responsible for the sales. Responsibility for soliciting and forwarding purchase orders and for maintaining and repairing equipment is consistent with Eden's status as Ryko's agent, and does not demonstrate Eden's entrepreneurial independence. *See Calculators Hawaii*, 724 F.2d at 1336. Similarly, Eden's required capital investment as a distributor apparently was limited to $500. Tr. 721. We do not believe this limited investment reflects the type of independent risk bearing that was present in *Simpson* or *Greene*. Finally, the method by which Ryko compensates Eden with respect to NAP sales—a price-based commission with which Eden must cover its own operating expenses—is a similarly insufficient basis for the conclusion that Eden acts as an independent entrepreneur with respect to NAP sales. Such compensation by commission is totally consistent with Eden's role as a sales agent; it does not, standing alone, illustrate Eden's entrepreneurial independence. *Cf. Holter v. Moore and Co.*, 702 F.2d 854, 856 (10th Cir.) (citing *American Oil Co. v. McMullin*, 508 F.2d 1345, 1351–52 (10th Cir.1975)), *cert. denied*, 464 U.S. 937, 104 S.Ct. 347, 78 L.Ed.2d 313 (1983).

**Sight Draft Sales**

Eden points out that some of its sales to NAP customers have been made by sight draft, and in those sales Eden has taken title to the machines before "reselling" them to the customer. *See, e.g.,* Ex. C–7, D–7, L–7, V–7, W–7, X–7. Eden argues

could conclude, if put to the choice, that buyers of products from a manufacturer's sales representative were "customers" of the representative, rather than of his employer. Indeed, if the sales representative were to change employers, many of his former customers might be expected to continue to do business with him and to

begin ordering goods from the representative's new supplier. However, as a matter of antitrust law, both of the representative's employers would be equally free to set the price at which he sold their goods, regardless of whether the ultimate buyers might be considered "customers" of the representative.

that under *Simpson* and *Greene*, it bears the economic risks in these sight draft transactions, but is prohibited by the NAP provisions of the distributorship contract from negotiating a price different from the NAP price for machines so sold. Eden repeatedly asserts that NAP pricing is "mandatory" for all sales to NAP customers, regardless of whether Eden secures purchase orders for Ryko or sells the machines by sight draft. Ryko admits that Eden takes title to machines sold by sight draft, but argues that NAP pricing does not apply to any sight-draft sales, even those to NAP-designated customers.

The lesson of *Simpson* is that locus of title is not itself a sufficient basis on which to determine antitrust liability. 377 U.S. at 21–22, 84 S.Ct. at 1056–57. The real issues are whether Eden bears significantly greater economic risks in sight-draft transactions with NAP customers than it does in soliciting purchase orders, and, if so, whether Ryko conspired to fix Eden's resale price in sight-draft transactions. We believe that Eden again failed to submit sufficient evidence from which a jury reasonably could infer that Eden bears such risks, even on those sales in which it takes title to the machines and then passes them on to NAP-designated customers.

Eden apparently requires its purchasers in sight-draft transactions to deposit the purchase price with Eden's bank before Eden will issue the necessary sight draft to Ryko for final delivery. Ex. 93. This type of prepaid transaction does not involve sig-

nificantly greater financial risks than purchase order transactions, because Eden incurs no liability for payment on the machines before it receives advance payment from the customer. Eden has not produced evidence suggesting that it buys machines on speculation, provides financing for,[6] or takes possession of machines sold to NAP customers by sight draft before final delivery to the customer.[7] Similarly, although Eden is responsible for the collection and payment of state sales taxes on sight-draft sales, we do not believe that this added responsibility significantly shifts the locus of risks in the transactions.

Finally, Eden has not demonstrated that Ryko is any less involved in promoting and soliciting national approval for its products sold to NAP customers by sight draft than for those sold by purchase order, nor has Eden shown that it bears significantly greater economic risks in these sales. Accordingly, for sight-draft sales to NAP customers, we also conclude that Eden has produced insufficient evidence of its independent entrepreneurial status to support a jury verdict. Moreover, even if we held that Eden produced sufficient evidence of risk bearing, we would be unable to affirm the resale price maintenance verdict, because Eden has failed to show that Ryko conspired to fix the prices that Eden charged its customers on sight-draft sales.

Eden bears the burden of "present[ing] direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commit-

---

**6.** In a sales proposal to a Gulf Oil Company district office, Eden referred to one prior sale in which it accepted a purchase order from Gulf covering the equipment, construction, plumbing and electrical work involved in the installation of a Ryko machine. Ex. 4; Ex. DDD. In the letter, Eden requests that the purchase order for the latest proposal be separated into its various components (and that the order for the machine be made out directly to Ryko) to relieve Eden "of the burden of financing the project up front, as we did for the Columbia project...." Ex. 4. The letter makes clear that Eden did not wish to make a practice of providing such financing for the customer. Significantly, on the sale proposed in the letter, Ryko extended 30–day credit to Eden, thus relieving Eden of the responsibility of issuing a sight draft for delivery of the equipment before Eden received payment from

the customer. Eden assured Ryko that "normal bid and contract procedures" would be followed on the next sale. Ex. 14. Given Eden's own characterization of such financing as an exception, we do not believe this single instance should be significant in our analysis of the entire economic relationship.

**7.** Although Eden produced two invoices purporting to show that Ryko had delivered machines directly to Eden for installation at other locations, neither of these sales were to NAP customers. Ex. E–8, F–8. One of the sales was to a previous NAP customer, but the customer had been removed from the NAP approximately a year before the sale, and Ryko no longer required its distributors to give the customer NAP pricing. Ex. H–2.

**1228**

ment to a common scheme designed to achieve an unlawful objective.'" *Monsanto,* 465 U.S. at 764, 104 S.Ct. at 1471 (citation omitted). The plaintiff must produce evidence that is "sufficient for the jury to determine not merely that the manufacturer ... conspired, but that ... [it] conspired *to maintain resale prices." McCabe's Furniture,* 798 F.2d at 329 (citation omitted) (emphasis added). To meet this burden, Eden relies exclusively on its interpretation of the NAP provisions contained in its distributorship contract with Ryko and on the various NAP policy statements implementing those provisions. This is not a case involving complaints by other distributors about a price-cutting distributor or warnings from the manufacturer that it would not tolerate price deviations by its distributors. *Compare Monsanto,* 465 U.S. at 763, 765, 104 S.Ct. at 1470, 1471. In these circumstances, a jury could not

reasonably find that Ryko entered into an agreement to fix Eden's resale prices unless the contract provisions and policy statements themselves fix those prices.[8]

Although Ryko has admitted that the NAP dictates the price at which goods are sold by purchase order directly to the NAP customers, Ryko denies that the NAP policies apply to sight draft sales. Eden argues that the contract provisions and the policy statements constitute an agreement to fix prices for all sales to NAP customers, either by sight draft or by purchase order. In the alternative, Eden argues that Ryko's "agreements" with the NAP customers regarding the availability of equipment at NAP prices satisfy the concerted action requirement.[9]

The evidence does not support Eden's interpretation of the relevant contract provisions.[10] At trial, Eden attempted to isolate the pricing provisions of the distribu-

8. Ryko objected only to the sufficiency of the evidence on the proof of an antitrust agreement, and we therefore are extremely limited in our review of the instruction regarding the required finding. *See Denniston v. Burlington Northern, Inc.,* 726 F.2d 391, 393 (8th Cir.1984) (citing *Board of Water Works Trustees v. Alvord, Burdick & Howson,* 706 F.2d 820, 824 (8th Cir.1983)). We do not believe that, as a matter of Iowa law, the jury was the proper interpreter of Eden's legal obligations under the distributorship contract. *See, e.g., Farm Bureau Mutual Ins. Co. v. Sandbulte,* 302 N.W.2d 104, 107–08 (Iowa 1981). However, because of our view of the evidence, we need not decide whether submitting the interpretation of the NAP contract provisions to the jury constituted plain error.

9. The instructions allowed the jury to find that Ryko had conspired with the final consumers to fix prices. Special Interrogatory 5(a), which the jury answered in the affirmative, asked the jury whether Ryko had agreed with "its distributors and/or its national account customers to fix the resale prices of Ryko's car washing equipment." Again, we are faced with an instruction to which no objection was raised, but which does not state the law. We do not agree with the suggestion that a supplier may be found to have conspired with the consumer to fix resale prices. *Compare Rea v. Ford Motor Co.,* 497 F.2d 577, 590–91 & n. 29 (3d Cir.), *cert. denied,* 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974). Ryko is perfectly free to fix a price for its products and to solicit sales at that price without incurring antitrust liability. *Dunn v. Phoenix Newspapers, Inc.,* 735 F.2d 1184, 1187–88 (9th Cir.1984). "There is an obvious agreement between [a supplier] and its direct custom-

er, the buying consumer. But such omnipresent agreements are not resale price restraints." P. Areeda, VII *Antitrust Law* ¶ 1451(f) (1986). However, because we hold that Eden did not produce sufficient evidence to demonstrate a conspiracy between Ryko and its NAP customers regarding the price for machines sold by sight draft, we need not address as plain error the validity of Eden's theory that Ryko may be found liable for entering into such an agreement with the ultimate consumer.

10. The provisions of Eden's distributorship contract (Ex. 1) dealing with the NAP are as follows:

IV. PRICE AND CREDIT STRUCTURE.

. . . .

E. Pricing structures for all major oil companies and national accounts shall be determined by the Company [Ryko]. Accounts may be declared national accounts at the Company's discretion.

. . . .

G. Purchase orders issued from major oil companies or national accounts headquarters will be issued in the name of the Company and shall be sent directly to the Company. H. Purchase orders issued from major oil companies or national accounts headquarters shall not require a deposit and goods concerned will not be shipped on a sight draft. I. Billing of purchase orders issued by major oil compan[ies] or national account headquarters will be handled by the Company. Commissions on said accounts will be paid to the Distributor upon collection of the purchase order price.

torship contract and policy statements, *see, e.g.,* Tr. 433–40, while ignoring the provisions regarding the method of sale. This approach cannot withstand scrutiny, because it attempts to separate the NAP pricing structure from the rest of the NAP provisions. Eden must show that Ryko *"knowingly* participated in an arrangement *with an intent"* to engage in resale price fixing. *Impro Products, Inc. v. Herrick,* 715 F.2d 1267, 1276 (8th Cir.1983). Moreover, Eden must show that Ryko attempted to fix Eden's resale prices or attempted to terminate Eden as "part of or pursuant to" such an arrangement. *Monsanto,* 465 U.S. at 767, 104 S.Ct. at 1472. Neither of these inquiries may be answered by reference to a single provision of the NAP. The contract and the policy statements implementing the program should be construed as a whole, without focusing on one clause to the exclusion of the others. *See Allen v. Highway Equipment Co.,* 239 N.W.2d 135, 139 (Iowa 1976).

The contract clearly permits Ryko to determine prices for national accounts, but equally clearly establishes the transactional procedure to be followed in making NAP sales. The contract directs Eden to make NAP sales by soliciting customer purchase orders issued directly to Ryko. The program does not apply to sight-draft sales for Eden's own account; the contract plainly states that equipment ordered under the NAP "shall not require a deposit" and "will not be shipped on a sight draft." The NAP policy statements confirm the procedure, emphasizing that NAP sales are made on credit to the NAP purchaser, based on purchase orders issued in Ryko's name. Ex. 70, 78, 80, I; J.A. 255.

Eden's sight-draft sales to some NAP customers at NAP prices are not evidence to the contrary. While such sales might be consistent with an agreement regarding prices on sight-draft sales, they do not demonstrate that such an agreement exists. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*

*Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986). Indeed, the evidence suggests that Eden was coerced not by Ryko but by the demands of informed consumers to charge NAP prices on these sales. Although it borders on the ridiculous to assert that a manufacturer's supply agreements with end-users could ever meet the concerted action requirement for resale price maintenance,[11] in this case Ryko's NAP customer agreements clearly do not attempt to fix Eden's prices on sales for its own account. Rather, the agreements merely assure the NAP customers of discounted prices for equipment purchased directly from Ryko. If potential buyers already knew the price at which they could purchase a machine directly from Ryko, distributors would find it extremely difficult to sell to those same buyers at a higher price. Eden's contractual duties to solicit and to accept NAP purchase orders for Ryko equipment at NAP prices do not transform the NAP customer agreements into conspiracies to fix Eden's resale prices.

Finally, although Ryko's initiation of a declaratory judgment action following Eden's bid to Crown McLean, a Virginia customer, may demonstrate Ryko's dissatisfaction with Eden's performance as a distributor, Eden has failed to produce evidence that Ryko's response was pursuant to an illegal price fixing agreement. *Monsanto* makes clear that "independent action by the manufacturer, and concerted action on nonprice restrictions [must] be distinguished from price-fixing agreements." 465 U.S. at 763, 104 S.Ct. at 1470. The *per se* rule does not apply to a manufacturer's unilateral termination of a price-cutting distributor, *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *Famous Brands, Inc. v. David Sherman Corp.,* 814 F.2d 517, 523 (8th Cir.1987), nor does it apply to the manufacturer's contractual imposition of nonprice restrictions. *See Sylvania,* 433 U.S. at 51 n. 18, 97 S.Ct. at 2558 n. 18.

---

**11.** *See* footnote 9, *supra.*

Eden's bid to Crown culminated a year-long deterioration in its business relationship with Ryko. More significantly, Eden's bidding tactics were not well received by Crown's central management, who informed Ryko that such tactics would "make it difficult to maintain the trust and credibility between our companies." Ex. 28. Eden's bid to Crown included a discount off the NAP price, which Eden suggests was the true reason for Ryko's response. However, the location of the proposed project was an exclusive territory that was the subject of an ongoing dispute between Eden and Ryko, and the bid included a proposal for the installation of Eden's own water reclaim system, which Ryko maintains was in violation of the exclusive dealing provisions of the distributorship contract.

Given these circumstances, we do not believe that Ryko's response to the bid reasonably can be viewed either as inconsistent with permissible defense of its business relationship with its NAP customers or as evidence of an agreement restricting Eden's resale prices on sight-draft sales. Cf. *Matsushita*, 106 S.Ct. at 1357. Eden has demonstrated the extent of its contractual dispute with Ryko. The evidence, however, simply does not support Eden's resale price maintenance claim. This case does not involve a dominant supplier's control of retail prices through a vast network of independent distributors who bear the primary risks of the distribution process. Compare *Simpson*, 377 U.S. at 20–22, 84 S.Ct. at 1056–57; *Green*, 517 F.2d at 653. We conclude that the evidence was not sufficient to place the resale price maintenance claim before the jury, and that with respect to this claim the District Court erred by denying Ryko's motion for judgment notwithstanding the verdict.

**Exclusive Territories**

Ryko next appeals the jury verdict in favor of Eden on its claim that the exclusive territory provisions of Ryko's distributorship contracts violate Section 1 of the Sherman Act. These provisions grant each distributor the exclusive right to sell Ryko products within an assigned territory [12] and prohibit the distributor from selling Ryko products outside that territory.

The Supreme Court recently has reaffirmed the well-established rule that "[contractual] nonprice restrictions imposed by a single manufacturer [on its distributors] are to be judged under the rule of reason." *324 Liquor Corp. v. Thomas Duffy*, —— U.S. ——, 107 S.Ct. 720, 724, 93 L.Ed.2d 667 (1987). In applying this rule to a particular nonprice restraint, we must examine the relevant market and weigh any loss in intrabrand competition caused by the restraint against any corresponding gain in interbrand competition. *Sylvania*, 433 U.S. at 54–55, 97 S.Ct. at 2559–60. Notwithstanding the broad applicability of the rule recognized in *Sylvania*, Eden urges here, as it did below, that a *per se* rule should apply to Ryko's exclusive territory provisions. Eden argues that Ryko's practice of acting as its own distributor in territories where it has no other distributor (such as Eden) [13] transforms the otherwise vertical distributorship contracts into horizontal agreements among competing distributors.

Although there is some support for Eden's position, especially where an agreement restricts a distributor who also competes with the supplier in the manufacture of certain products in the relevant market, see, e.g., *Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 899–900 (5th Cir.), cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973), we believe the better-reasoned cases examine nonprice restraints in the dual distribution context under the rule of reason. See *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481 (9th Cir.1986), *modified on other*

---

**12.** Although Eden's contract designates only the District of Columbia and Maryland as Eden's exclusive territory, Eden's claim to distribution rights in certain portions of northern Virginia is a part of this lawsuit.

**13.** This practice is known as dual distribution. The term is useful here only in discussing Ryko's sales to its distributors for their own account. As discussed earlier, for antitrust purposes the distributors act as Ryko's agents in making NAP sales.

*grounds,* 810 F.2d 1517 (9th Cir.1987); *Davis-Watkins Co. v. Service Merchandise,* 686 F.2d 1190, 1201–02 (6th Cir.1982), *cert. denied,* 466 U.S. 931, 104 S.Ct. 1718, 80 L.Ed.2d 190 (1984); *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1355–57 (9th Cir.1982); *Copy-Data Systems, Inc. v. Toshiba America, Inc.,* 663 F.2d 405, 409–11 (2d Cir.1981); *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422, 425–28 (5th Cir.1981); *Donald B. Rice Tire Co. v. Michelin Tire Corp.,* 638 F.2d 15, 16 (4th Cir.), *cert. denied,* 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). We are mindful of the Supreme Court's directive that we depart from the rule of reason only "upon demonstrable economic effect rather than—as in *Schwinn*—upon formalistic line drawing." *Sylvania,* 433 U.S. at 59, 97 S.Ct. at 2562. Moreover, in dealing with vertical nonprice restraints the focus of antitrust concern is the impact of a particular restraint on interbrand competition, rather than its impact on intrabrand competition. *Id.,* at 52 n. 19, 97 S.Ct. at 2558 n. 19; *see also Copy-Data Systems,* 663 F.2d at 409. This is especially true in cases where substantial competition in the interbrand market provides a check on the exploitation of intrabrand market power by providing a ready supply of adequate substitutes to consumers. *Copy-Data Systems,* 663 F.2d at 409. *But see Eiberger v. Sony Corp.,* 622 F.2d 1068, 1081 (2d Cir.1980).

When competing distributors conspire with their supplier to impose restrictions that redound primarily to the benefit of the distributors, the agreement should be considered horizontal even though it is vertical in form. *See United States v. Sealy, Inc.,* 388 U.S. 350, 353–54, 87 S.Ct. 1847, 1850–51, 18 L.Ed.2d 1238 (1967). Absent such an attempt to disguise a conspiracy for the

benefit of competitors, "[i]f the evidence is consistent with the hypothesis that the firm at the top of the vertical chain designed the restrictions for its own purposes, an inference of [horizontal] conspiracy is inappropriate." *Illinois Corporate Travel, Inc. v. American Airlines, Inc.,* 806 F.2d 722, 726 (7th Cir.1986). Accordingly, we conclude that the District Court correctly decided that the rule of reason applies to the exclusive territory provisions of Ryko's distributorship agreements.

Having carefully examined the record from a rule-of-reason perspective, we hold as a matter of law that Eden did not present a submissible case that the exclusive territory provisions were unreasonable. As a preliminary matter, the plaintiff's "[p]roof that defendant's activities had an impact upon competition in the relevant market is 'an absolutely essential element of the rule of reason case.'" *Supermarket of Homes, Inc. v. San Fernando Board of Realtors,* 786 F.2d 1400, 1405 (9th Cir.1986) (quoting *Calculators Hawaii,* 724 F.2d at 1338). It follows that a showing that the defendant has market power is equally essential, because "[f]irms lacking market power ... cannot adopt restraints that have anticompetitive effects ... [and thus] cannot have an effect on interbrand competition." *Assam Drug Co. v. Miller Brewing Co.,* 798 F.2d 311, 316 (8th Cir.1986). Notwithstanding dicta from two of this Court's prior decisions, *see id.* at 316 n. 14 (citing *National Reporting Co. v. Alderson Reporting Co.,* 763 F.2d 1020, 1024–25 (8th Cir.1985) and *Hiland Dairy, Inc. v. Kroger Co.,* 402 F.2d 968 (8th Cir. 1968), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969)), we agree with the approach adopted by other circuits requiring "at the threshold that the plaintiff attacking a vertical nonprice restraint prove the defendant's substantial market power in a relevant market." *Assam,* 798 F.2d at 316 (citing cases).[14]

---

**14.** Nothing in *NCAA v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), or *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986), is to the contrary. In those cases, the Supreme Court observed in the context of horizontal

combinations that "the absence of proof of market power does not justify a naked restriction on price or output." 468 U.S. at 109–10, 104 S.Ct. at 2964–65; *see also* 106 S.Ct. at 2018–19. The vertical restrictions at issue here obviously do not involve a "naked" attempt to restrict output

■ Market power generally is defined as the power of a firm to restrict output and thereby increase the selling price of its goods in the market. *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc.*, 784 F.2d 1325, 1335 (7th Cir.1986). Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product (which decreases the competitive impact of substitutes) and where there are significant barriers either to the entry of new firms or to increased output by existing firms. *Id.* at 1335–36. On the other hand, direct evidence of competitive pressure—demonstrated by a significant number of viable competitors in the market, *see, e.g., Red Diamond Supply*, 637 F.2d at 1005, or by the entry of new competitors, *Donald B. Rice Tire Co. v. Michelin Tire Corp.*, 483 F.Supp. 750, 761 (D.Md.1980), *aff'd*, 638 F.2d 15 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981), or even by the product's price sensitivity—indicates a lack of market power. It is incumbent on the plaintiff to present evidence of defendant's power in the relevant market, and we find as a matter of law that Eden failed to meet this requirement.

Eden devoted much of its time at trial attempting to convince the jury that Ryko was the dominant force in a small market consisting only of automatic "rollover" carwash machines. The jury specifically rejected this narrow characterization of the market, finding instead that the relevant product market encompassed car-washing equipment in general, "including automatic rollover machines, drive-thru machines, tunnel equipment and wand or hand-held equipment." Special Interrogatory 9. The determination of the relevant market is an issue for the trier of fact, *General Industries Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 805 (8th Cir.1987), and here the record adequately supports the jury's finding.[15]

Ryko clearly does not possess the type of market power that would allow it to restrict output or raise prices in the relevant market found by the jury. Eden's entire case regarding Ryko's market power rested on an assumption that the relevant product market consisted only of automatic rollover machines. Eden's expert witness focused exclusively on Ryko's share of the automatic rollover market, Tr. 1699–1700, 1709, and he admitted that he had insufficient data from which to draw conclusions regarding Ryko's market power in a more broadly defined market. Tr. 1725. The record shows that Ryko's share of the entire relevant market is at most between 8% and 10%. This makes it the second largest car-wash equipment manufacturer, which suggests a market whose supply side consists of many small competitors.

Although some of Eden's witnesses testified that equipment buyers have a strong preference for Ryko's rollover equipment,

---

or raise prices. Rather, they are "'ancillary' restraints, those that are part of a larger endeavor whose success they promote." *Polk Bros., Inc. v. Forest City Enterprises*, 776 F.2d 185, 188–89 (7th Cir.1985). It is true that "'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Indiana Federation*, 106 S.Ct. at 2019 (quoting VII P. Areeda, *Antitrust Law* ¶ 1511, at 429 (1986)). However, unless the plaintiff can demonstrate an "actual detrimental effect" on competition (which in a meaningful sense demonstrates the defendant's market power), the threshold market power requirement mitigates an otherwise "unlimited inquiry necessary under the rule of reason." *Assam*, 798 F.2d at 316. Here, Eden's own witness admitted that he had no evidence that the territorial restrictions had any impact on market price or output. Tr. 1728–29.

**15.** There was ample evidence from which the jury could conclude that the various car-wash systems were essentially interchangeable in the eyes of consumers and that the systems formed one relevant product market. Tr. 2060–64. Eden's expert witness gave testimony regarding the distinct markets served by the various kinds of equipment and argued that rollovers, tunnel washes, and wand systems were not competitive substitutes for one another. However, on cross-examination, the same witness volunteered, without being asked, that locating the three types of systems in close proximity to one another "would have been a bad marketing decision." Tr. 1717. The jury could have concluded that if the three systems comprised distinct product markets and truly were not in competition with each other, then their proximity should not have any effect on their profitability.

such preferences are not, without more, a sufficient basis for finding the extent of market power. This is particularly true where, as here, the testimony regarding consumer preference for a particular item pertains to a narrow product submarket, rather than to the broader relevant product market. Similarly, although Ryko represents itself in sales material as the "recognized leader" or "the Cadillac" of the car-wash industry (and Eden's counsel repeatedly attempted at trial to characterize these types of statements as evidence of market dominance, Tr. 751–59), such self-serving promotional literature hardly can be viewed as evidence of market power. In any case, it clearly is not sufficient in this case. The evidence shows that Ryko has lost sales when its competitors lowered their prices in the submarket for rollover machines, Ex. 74, and that Ryko has little or no share of the submarket for drive-thru equipment. Ex. W. Finally, we note that the District Court was persuaded that Ryko could not safely post a supersedeas bond for more than $300,000 without jeopardizing its business. It seems absurd to suggest that such a company has substantial market power in a nationwide industry with annual revenues of between $150 and $225 million. Ex. 114–117.

■ The jury could not reasonably have concluded, based on the evidence presented, that Ryko possessed market power in a relevant product market including all types of car-wash equipment. Absent an adequate showing of market power, or of actual detrimental effects on competition, the jury did not have a sufficient basis from which to conclude that Ryko's territorial restrictions unreasonably restrained competition. Accordingly, the District Court erred in denying Ryko's motion for judgment notwithstanding the verdict on Eden's Sherman Act claim with respect to the exclusive territory provisions.

16. The parties did not extensively address the Section 1 claim in this appeal, but our resolution of the Clayton Act claim disposes of the issue. If a contract is not prohibited by "the broader proscription of § 3 of the Clayton Act it

**Exclusive Dealing**

Eden claims, and the jury found, that the exclusive dealing provisions of its distributorship contract, which prohibit the distributor from promoting or selling products that compete with Ryko's, violate Section 1 of the Sherman Act and Section 3 of the Clayton Act.[16] Contracts imposing an obligation on a distributor to deal only in the goods of a single supplier will violate Section 3 when "performance of the contract will foreclose competition in a substantial share of the line of commerce affected.... That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited...." *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327–28, 81 S.Ct. 623, 627–28, 5 L.Ed.2d 580 (1961). This test requires us to examine the character of the relevant market and to assess the competitive impact of the alleged restraints. We no longer evaluate foreclosure under the purely quantitative test of earlier decisions. *Compare Standard Oil Co. v. United States,* 337 U.S. 293, 314, 69 S.Ct. 1051, 1062, 93 L.Ed. 1371 (1949) *(Standard Stations)* (quantitative test) *with Tampa Electric,* 365 U.S. at 329, 81 S.Ct. at 629 (substantiality of foreclosure determined by more detailed analysis of the "probable effect of the contract on the relevant area of effective competition"). Where the degree of foreclosure caused by the exclusivity provisions is so great that it invariably indicates that the supplier imposing the provisions has substantial market power, we may rely on the foreclosure rate alone to establish the violation. However, where, as here, the foreclosure rate is neither substantial nor even apparent, the plaintiff must demonstrate that other factors in the market exacerbate the detrimental effect of the challenged restraints. *Cf. Beltone Electronics Corp.* 100 F.T.C. 68, 204, 209–10 (1982) (requiring more extensive analysis of the "dynamics of the affected market" even where rate of foreclosure is not "clearly insignificant").

follows that it is not forbidden by those of the [Sherman Act]." *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 335, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961).

We agree with the conclusion reached by the FTC in *Beltone* that in light of *Sylvania* and its progeny, exclusive dealing should be evaluated under an analysis "which takes into account not only the market share of the firm but the dynamic nature of the market in which the foreclosure occurs." *Id.* at 197. The inquiry is not precisely the same as the rule of reason employed to evaluate vertical nonprice restrictions under the Sherman Act. However, the plaintiff must show "that the restraint ... has a probable adverse effect on interbrand competition." *Id.* at 208. This showing depends upon an analysis of such market factors as: the willingness of consumers to comparison shop and their loyalty to existing distributors; the existence of entry barriers to new distributors; the availability of alternative methods of distribution; and any trend toward growth (or decline) in the level of competition at the supplier level. *See id.* at 210; *see also Joyce Beverages v. Royal Crown Cola Co.*, 555 F.Supp. 271, 278 (S.D.N.Y.1983) (availability of alternative methods of distribution precludes finding that supplier is foreclosed from market); *see generally* Steuer, *Exclusive Dealing in Distribution*, 69 Cornell L.Rev. 101 (1983).

■ Eden has produced no evidence suggesting that Ryko's exclusive dealing provisions generally prevent Ryko's competitors from finding effective distributors for (or other means of promoting and selling) their products. Rather, Eden charges that these provisions foreclose competition by preventing Eden from marketing its own water reclaim unit. The short answer to Eden's argument is that the concern of antitrust law is the protection of competition, not individual competitors; the law is not designed to relieve a particular business of the burden of making the difficult choice between manufacturing its own product or distributing the product of another concern. *See Razorback Ready Mix Concrete Co. v. Weaver*, 761 F.2d 484, 488 (8th Cir.1985) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977)). More generally, however, Eden's claim rests upon the assumption that car-wash equipment buyers prefer to engage in "one-stop shopping," and that to distribute an accessory product such as a water reclaim, a supplier must either employ a distributor who already carries a full line of car-wash equipment or must market a complete line of its own. Tr. 1702. Accepting this assumption at face value, we may conclude that manufacturers of accessory devices are foreclosed from the market to some extent by Ryko's exclusive dealing agreements with its distributors. However, Eden has not presented sufficient evidence from which a rational trier of fact could conclude that the foreclosure rate is "substantial" within the meaning of Section 3.

Eden argues that Ryko's 8% to 10% share of total sales in the relevant market demonstrates a corresponding rate of foreclosure sufficient to meet the test of *Tampa Electric*. We find this argument wholly unpersuasive. That Eden is prohibited from offering the products of competing manufacturers is not itself significant.[17] Ryko's other distributorship contracts are apparently less restrictive than Eden's, in terms of either the scope of the non-compete provision or its duration.[18] According-

---

17. Indeed, the overall effect on interbrand competition in such cases may be beneficial by focusing the distributor's efforts on one product line and, in turn, removing the "free rider" threat to the manufacturer's own selling efforts. Where, as here, the manufacturer engages in promotional activity that is designed to dovetail with the distributor's efforts, an exclusive dealing clause guarantees that the manufacturer's marketing investment will not be lost to other firms when the distributor makes his sales presentation to potential buyers. This assurance encourages the manufacturer's investment in marketing activity, and thus encourages inter-brand competition. That Ryko's concern over its investment in marketing was legitimate is aptly illustrated by Eden's attempt to sell its reclaim by comparing Ryko's unfavorably to its own. Tr. 1001, 1025–26.

18. Ryko repeatedly offered Eden updated contracts containing less restrictive exclusivity provisions, but Eden refused to sign the newer versions, in part because it preferred the protection offered by the more restrictive exclusive dealing and exclusive territories provisions of the contract it already had. Tr. 362–66, 1164–65, 1327–29.

ly, any foreclosure resulting from the provisions of Eden's contract would not necessarily apply to Ryko's other distributors, and Eden has presented no evidence suggesting a foreclosure rate arising from Ryko's other distributorship contracts. Moreover, there is no evidence that a substantial segment of the equipment buying market will deal only with Ryko's distributors, or that the exclusive dealing provisions have any impact on the ability of Ryko's competitors to make sales presentations to any potential customer through their own distributors or through direct sales representation. Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of "substantial foreclosure," because it is less clear that a restraint involving a distributor will have a corresponding impact on the level of competition in the consumer market. *Cf. Bowen v. New York News, Inc.*, 366 F.Supp. 651, 679–80 (S.D.N.Y.1973) (Section 3 claim dismissed where plaintiffs made no showing that exclusive dealing contracts limited interbrand competition or that competitors could not enter market through other distributors), *aff'd in part, rev'd in part on other grounds*, 522 F.2d 1242 (2d Cir.1975), *cert. denied*, 425 U.S. 936, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976). Eden has failed to meet that standard here. Although it is possible that some level of foreclosure exists in the market for accessories such as water reclaim units, Eden has not demonstrated that this foreclosure is in any way "substantial." [19] The evidence of foreclosure was not sufficient to create an issue of fact for the jury. Accordingly, the District Court erred in denying Ryko's motion for judgment notwithstanding the verdict on Eden's exclusive dealing claim.

**Tying**

Eden's final antitrust claim is that Ryko tied sales of its water reclaim device to sales of rollover car-wash machines in those sales for which a water reclaim system was required. This claim clearly fails because Eden's evidence does not demonstrate that Ryko ever forced consumers "into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). The sole foundation for Eden's tying claim is a letter from Ryko to Eden which states that "any RYKO car wash equipment ordered to be installed in your territory cannot be supported by Eden water reclaim equipment sold by you." Ex. 76. One of Eden's witnesses also testified that Ryko had implemented the statement contained in the letter. Tr. 1249.

This evidence plainly is insufficient to establish an illegal tying arrangement. The statement clearly does not suggest that Ryko conditioned the sale of its rollover equipment upon either Eden's or the customer's purchase of a Ryko water reclaim device, but merely restates Eden's obligations under the exclusive dealing provisions discussed above. Neither Eden nor any of its customers was required to purchase a Ryko reclaim device in order to purchase a Ryko car-wash machine, and thus the challenged arrangement fails to meet the basic definition of a tying arrangement. *See Northern Pacific Ry. v.*

---

19. Eden suggests that approximately 63% of its car-wash machine sales during 1982 and 1983 required a reclaim. Because this percentage is based on Eden's sales of Ryko rollover equipment, we have no way of knowing what percentage of the total carwash market requires a reclaim system. Moreover, the "one-stop shopping" argument clearly applies only to buyers who purchase the accessories as original equipment. Buyers who decide to purchase additional equipment to upgrade previously installed car-wash machines—for example, a water reclaim purchased to comply with a newly enacted local ordinance—are free to purchase such accessories from manufacturers who do not offer a full line of equipment. In addition, Eden's testimony confirms that local regulations increasingly require reclaim systems. Tr. 1773. To the extent that this regulatory trend affects existing wash sites, the demand for separately purchased reclaim units can be expected to increase. This would, in turn, decrease the relative level of foreclosure in the entire market caused by foreclosure with respect to original equipment buyers. In these circumstances, there is insufficient evidence from which to conclude how much of the accessory market, if any, is actually foreclosed.

*United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518–19, 2 L.Ed.2d 545 (1958); *Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n.,* 666 F.2d 1130, 1140 (8th Cir. 1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). Customers were free to purchase a car-wash machine or water reclaim from Ryko and to purchase the other item separately from any other manufacturer. *See Northern Pacific,* 356 U.S. at 6 n. 4, 78 S.Ct. at 518 n. 4. Eden merely was bound by its contractual obligation as a Ryko distributor not to promote or sell products that competed with Ryko products.

Eden refers us to *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), and the suggestion in that case that conditioning the lease of a service station to a franchisee upon the franchisee's agreement to purchase gasoline solely from the franchisor might constitute a tying arrangement. *Id.* at 452. Whatever the merits of this suggestion, we find *Bogosian* inapplicable here. Car-wash equipment is sufficiently differentiated to justify a manufacturer's concern for the quality of accessory products sold in conjunction with its equipment. *Compare id.* at 453 (noting apparent fungibility of gasoline of similar octane rating); *see also* Austin, *The Tying Arrangement,* 1967 Wis.L.Rev. 88, 115–16. Moreover, as noted in *Jefferson Parish,* "[i]f only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." 466 U.S. at 16, 104 S.Ct. at 1560. Because Ryko's customers are free to shop else-where for a reclaim device, any "forcing" found here would affect only Ryko's distributors, and as we have already noted, the non-compete provisions of Ryko's newer distributorship contracts are substantially less restrictive than Eden's. Although we believe it is apparent that Eden has not demonstrated such forcing, it is absolutely certain that Eden has not shown that "a substantial volume of commerce" would be foreclosed if the requisite forcing were shown. *See id.* In these circumstances, a jury could not reasonably conclude that a tying arrangement existed. We therefore hold, as we already have held with respect to Eden's other antitrust claims, that the District Court erred in denying Ryko's motion for judgment notwithstanding the verdict on Eden's tying claim.[20]

**FRAUD**

Eden pursued several common law fraud theories at trial, and in a special interrogatory the jury found that Ryko had defrauded Eden.[21] Because we have no way of knowing which of the fraud theories the jury relied upon in rendering its verdict, each of the theories must be supported by sufficient evidence to create a jury question on that theory. If the evidence with respect to any of the theories is insufficient to make a submissible case as to that theory, we must set the fraud verdict entirely aside. *See Dudley v. Dittmer,* 795 F.2d 669, 673 (8th Cir.1986) (citing cases) ("The rule in this circuit is clear that when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand."); *Ratner v. Sioux Natural Gas Corp.,* 770 F.2d 512, 518–19 (5th Cir.1985) (reversal of general verdict for plaintiff on common law fraud claim required where

---

**20.** Our disposition of the antitrust claims necessarily requires a reversal of the District Court's award of attorney fees to Eden under Section 4 of the Clayton Act.

**21.** Eden claims that Ryko made fraudulent misrepresentations to Eden in five different respects:

 (1) That Ryko was committed to building a strong network of distributors;

 (2) That Ryko would not establish competing distributors in Eden's territory;

 (3) That Eden could market and install non-Ryko water reclaim systems;

 (4) That Eden could sell, install and service Ryko equipment in Virginia; and

 (5) That the distributor price for Ryko products [would] allow a 30% margin for the distributor.

Jury Instruction 14. Special Interrogatory 4, which the jury answered in the affirmative, asked simply whether Ryko had defrauded Eden. The Interrogatory makes no reference to and requires no findings regarding any of the individual theories of fraud. The fraud verdict thus is a general verdict, even though it took the form of an answer to a special interrogatory.

necessary element of proof was lacking in connection with one of six alleged misrepresentations); *compare Hinkle v. Christensen*, 733 F.2d 74, 76 (8th Cir.1984) (contrary rule where jury renders specific findings on submissible claims).

Under Iowa law, there are five distinct elements in an action for fraud: "(1) a material misrepresentation (2) made knowingly (scienter) (3) with intent to induce the plaintiff to act or refrain from acting (4) upon which the plaintiff justifiably relies (5) with damages." *Beeck v. Kapalis*, 302 N.W.2d 90, 94 (Iowa 1981). Moreover, the plaintiff must establish these elements by a "preponderance of clear, satisfactory and convincing evidence," rather than by a mere preponderance of all the evidence. *Omaha Bank for Cooperatives v. Siouxland Cattle Cooperative*, 305 N.W.2d 458, 463 (Iowa 1981). This heavier evidentiary burden "is mandated in fraud actions by the presumption of fair dealing accompanying a transaction." *Sedco International, S.A. v. Cory*, 522 F.Supp. 254, 322 (S.D. Iowa 1981), *aff'd*, 683 F.2d 1201 (8th Cir.), *cert. denied*, 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982). Under this standard, the evidence on at least three of Eden's fraud claims was insufficient to submit those claims to the jury.

■ Eden's claim that Ryko fraudulently misrepresented its intent regarding the establishment of competing distributors in Eden's territory is wholly unsupported by the evidence. Eden's 1977 distributorship contract includes a provision in which Ryko agrees that for the duration of the contract, "no other or different firm or corporation will be granted the privilege of selling [Ryko's] products in the [distributor's assigned] territory." In 1983, Ryko contracted with Texaco TBA, a corporation selling accessory equipment to Texaco Oil Company service station dealers, to become an approved supplier for the Texaco TBA program. Under the program, Ryko sells equipment to Texaco TBA for resale to individual Texaco dealers. Texaco Oil Company apparently provides some financial assistance to dealers in purchasing equipment from Texaco TBA, but Ryko deemed it necessary to provide Texaco TBA an additional discount below standard NAP pricing in order to become an approved supplier for the TBA program. The additional discount was absorbed jointly by Ryko and its distributors. Otherwise, the commission structure closely resembled the NAP, with the distributor receiving a commission on each machine sold by Ryko to Texaco TBA for installation in the distributor's territory. Eden's complaint thus is not that it received no commission on TBA sales. Rather, Eden complains that the profits earned by Texaco TBA (on its resale of the equipment to individual Texaco dealers) demonstrate that Eden could have received greater commissions by making sales directly to the dealers.

Viewing the evidence most favorably to Eden, and assuming *arguendo* that the Texaco TBA program constitutes a violation of Eden's exclusive distributorship, we find nothing in the evidence even remotely suggesting that Ryko knew its representations regarding Eden's exclusivity were false at the time they were made or that Ryko never intended to honor the exclusivity provision. Eden simply invited the jury to speculate that Ryko's alleged breach of the distributorship contract—in establishing a "competing" distributor in 1983— demonstrates its fraudulent intent in securing Eden's agreement to the 1977 contract. Under Iowa law, such speculation is plainly impermissible.

■ The evidence supporting Eden's claim of fraud regarding its right to sell, install, and service Ryko equipment in northern Virginia suffers from a similar defect. The evidence shows clearly that Eden's original territory did not include the counties in northern Virginia to which Eden now asserts an exclusive distributorship right. Ex. 3, L–6; Tr. 585, 708, 1114, 1296, 1467. With Ryko's approval, Eden reached a separate agreement with the Virginia distributor regarding the territory, but the continuing validity of that arrangement was brought into doubt by the termination of the Virginia distributor in 1980. Over the next two years, the parties attempted to come to an accommodation re-

garding the territory and eventually reached an agreement in April 1982. The agreement granted Eden the right to perform some distributor services in specified Virginia counties. For reasons that are disputed, the agreement never was honored. Whether this agreement effectively modified the parties' prior contract and whether the agreement subsequently was abandoned by one or both of the parties because of the other's nonperformance were questions for the jury. In any case, Eden presented no evidence, direct or circumstantial, from which a jury reasonably could conclude that Ryko misrepresented its intent to honor either the allocation of territories in the original distributorship contract or any subsequent agreement regarding Eden's right to distribute in northern Virginia. The evidence shows only that an extensive contract dispute arose between the parties, and that the dispute included a sharp disagreement over the scope of Eden's territory. That the jury ultimately rejected Ryko's position regarding Eden's contractual rights does not, without more, support an inference that Ryko acted with fraudulent intent. *Cf. Iconco v. Jensen Construction Co.*, 622 F.2d 1291, 1304 (8th Cir.1980) (contractor's unsuccessful dispute with SBA over contractor's status as small business does not support inference that contractor fraudulently certified itself as small business in bid for contract).

▪ Finally, Eden claims that Ryko fraudulently misrepresented the margin of return on sales that Eden would earn as a Ryko distributor. This claim similarly lacks evidentiary support. The record shows that Ryko had a legitimate dispute over pricing with Eden, with much of the dispute arising from Eden's refusal to sign an updated version of the distributorship contract, which includes new pricing provisions. Eden's 1977 contract provides explicit prices on only two Ryko machines, and Ryko no longer manufactures either machine. The contract further specifies that Eden's price for all other Ryko equipment "shall be retail price (as per current price list) less 30%." Eden convinced the jury that this provision guarantees Eden

the right to purchase Ryko equipment at the NAP price less 30%, rather than at the suggested retail price to non-NAP purchasers less 30%. We doubt that the jury's finding accurately reflects the intended meaning of this contractual provision, but the provision is ambiguous and we are unable to conclude that the jury's finding is based on insufficient evidence. However, Eden presented no evidence that Ryko knowingly encouraged Eden's contrary interpretation of the provision while intending to apply its own, or that Ryko possessed any intent to defraud Eden when agreeing that Eden's margin on sales of Ryko equipment would always be approximately 30%. Tr. 1110–11. Therefore, as in the case of the two fraud theories previously discussed, Eden did not make a submissible case on this theory of fraud.

▪ Eden's two remaining fraud claims, regarding Ryko's commitment to a strong distributor network and Eden's right to develop and market a water reclaim device, rest on very thin evidence, but we cannot say that they are so lacking in evidentiary support as to justify removing them from the jury's consideration. Nevertheless, as noted above, the rule in this Circuit requires in these circumstances that we set the fraud verdict aside, and remand for a new trial on both liability and damages with respect to the two theories of fraud that properly were submitted. *Dudley*, 795 F.2d at 673–74.

**BREACH OF CONTRACT**

▪ Eden's counterclaim also charged Ryko with breach of the distributorship contract, and the jury rendered a verdict in Eden's favor. We have discussed the evidence supporting two of Eden's theories of breach in connection with the fraud counterclaim. As observed above, the claims regarding the establishment of the Texaco TBA program and the parties' intent regarding pricing structure under the 1977 distributorship contract presented issues of fact for the jury. Although we may disagree with the verdict, we are not free to substitute our view of the facts for the jury's unless the only reasonable conclu-

sion from the evidence is contrary to the conclusion the jury reached. *See Northwestern National Ins. Co. v. Pope,* 791 F.2d 649, 652 (8th Cir.1986). The evidence on these issues is conflicting, but is reasonably susceptible to the interpretation proffered by Eden.

Eden's third claim for breach of contract is that Ryko wrongfully terminated Eden. The sole justification for the termination urged by Ryko in this appeal is Eden's promotion of a competitor's car-wash equipment in violation of the exclusive dealing provisions of the distributorship contract. Eden admitted to having received inquiries from several of Ryko's competitors following the initiation of Ryko's original declaratory judgment action and to having provided some of its customers with information and price quotations on at least one competitor's equipment. However, Eden argued to the jury that such conduct was justified by Ryko's conduct, and did not amount to a material breach of the exclusive dealing provisions.

 Under Iowa law, a breach must be material before it becomes a valid basis for unilateral termination of the contract by the non-breaching party, *see Beckman v. Carson,* 372 N.W.2d 203, 208 (Iowa 1985); *see also Maytag Co. v. Alward,* 253 Iowa 455, 112 N.W.2d 654, 660 (1962), and materiality is an issue of fact for the jury. *Cf. Des Moines Blue Ribbon Distributors v. Drewrys, Limited, U.S.A., Inc.,* 256 Iowa 899, 129 N.W.2d 731, 736–37 (1964) (whether distributor's performance under distributorship contract justified supplier's unilateral termination was issue for jury). In the present case, there was testimony from which the jury could find that Ryko anonymously solicited at least some of the competitive information from Eden, and that despite its contact with other equipment manufacturers, Eden continued to promote Ryko's products. This evidence provides a sufficient facutal basis from which a jury reasonably could conclude that Eden's conduct did not constitute a material breach of the distributorship contract and that Ryko's termination of Eden therefore was itself a material breach of the contract.

 Although we find that each of Eden's contract claims was supported by sufficient evidence, we cannot simply affirm the jury verdict for Eden on these claims. The jury awarded Eden damages only on its antitrust claims; our reversal of the judgment entered with respect to those claims leaves Eden without any recovery for its successful contract claims. In such circumstances we normally would remand the contract claims to the District Court for a new trial solely on the issue of damages. *But cf. McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1382 (8th Cir.), *modified on reh'g,* 722 F.2d at 1388–89 (8th Cir.1983) (requiring retrial of liability and damages on fraud claim where issues of liability and damages were inextricably intertwined), *cert. denied,* 469 U.S. 870, 105 S.Ct. 219, 83 L.Ed.2d 149 (1984). The circumstances of this case, like those in *McDonald,* demand a departure from our normal procedure.

The amount of Eden's recovery on its contract claims depends upon the precise nature of its distribution rights in northern Virginia. Ryko premised its own breach of contract claim against Eden in part on the assumption that Eden had no distribution rights whatsoever in northern Virginia. The jury rejected this assumption when it rendered its verdict that Eden had not breached its contract with Ryko. However, that verdict tells us nothing about the nature or the scope of the distribution rights the jury recognized. If the April 1982 agreement modified the existing contract provisions covering northern Virginia, then Eden's damages for breach would be significancly different than under the original 1977 distributorship contract, or under any side agreement with the Virginia distributor to which Ryko succeeded. This differential has an impact not only on the measure of Eden's lost commissions on Virginia sales, but on the recovery for Eden's claim that Texaco TBA was a competing distributor operating in its exclusive territory.

In this case, the measure of damages is completely intertwined with the issue of

liability, and we are not free to sever the two issues and to order a new trial limited solely to determining Eden's damages. *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 499–500, 51 S.Ct. 513, 514–15, 75 L.Ed. 1188 (1931). A trial on damages alone would require essentially the same evidence as a trial on both liability and damages, *see Colonial Leasing, Inc. v. Logistics Control International,* 770 F.2d 479, 481–82 (5th Cir.1985), and necessarily would require the jury to draw conclusions about the substantive nature of the parties' contractual agreements in northern Virginia. *See Gasoline Products,* 283 U.S. at 499–500, 51 S.Ct. at 514–15. As a result, the interest of judicial economy would not be served by limiting the retrial to damages.

Moreover, our concern for fundamental fairness leads us to favor a complete retrial of Eden's contract claims. Our extensive review of the record convinces us there is a substantial likelihood that the jury's consideration of the contract claims improperly was influenced by Eden's evidence and arguments on its antitrust claims. In rendering its antitrust verdicts, the jury necessarily concluded that under the antitrust laws Ryko could not enforce some of the key provisions in Eden's distributorship contract. That the antitrust verdicts—which for the reasons set forth earlier in this opinion cannot be allowed to stand—influenced the jury's decision regarding Eden's contract claims seems to us inescapable. This further supports our decision to remand the case for a new trial of the entire issue of Ryko's liability for breach of contract. *See Eximo, Inc. v. Trane Co.,* 748 F.2d 287, 290 (5th Cir.1984) (affirming district court's grant of new trial on distributor's contract claims, where district court believed jury was influenced by evidence on antitrust claims upon which directed verdict was granted), *modifying,* 737 F.2d 505, 513–14 (5th Cir.1984). We therefore set aside the verdict for Eden on its contract claims and remand for a new trial on both liability and damages with respect to those claims.

## CONCLUSION

To summarize, we hold that Eden's antitrust claims against Ryko are not supported by sufficient evidence and that the District Court therefore erred in denying Ryko's motion for judgment notwithstanding the verdict with respect to those claims. Accordingly, we reverse the judgment entered on the jury verdict awarding Eden damages on its antitrust claims.

Second, we hold that three of Eden's five theories of fraud lack sufficient evidentiary support to create a jury question on those three theories. Because the jury in effect rendered a general verdict on Eden's fraud claim, the entire fraud verdict must be set aside and the cause remanded for a new trial on both liability (with respect to the two remaining theories) and, if necessary, damages.

Third, we hold that the evidence supporting Eden's breach of contract claims is sufficient to support the jury's verdict for Eden on those claims. However, the jury did not determine Eden's damages with respect to its contract claims, and because the measure of damages on those claims cannot be separated from the substantive determination of Eden's contractual rights, we also must set aside the contract verdict and remand for a new trial on both liability and damages with respect to Eden's contract claims.

Fourth, our disposition of the case means that Eden is no longer entitled to attorney fees under Section 4 of the Clayton Act. We therefore reverse the District Court's award of attorney fees to Eden.

Finally, we dispose of Eden's motion on appeal challenging the length of Ryko's brief and the propriety under our rules of certain exhibits attached as addenda to the brief. We grant the motion with respect to Ryko's Supplemental Addendum B, but in all other respects the motion is denied. We wish to stress that all counsel are expected to adhere to this Court's rules regarding the length of briefs submitted, *see* Fed.R. App.P. 28(g), and scrupulously should review their briefs for references to the record that, by inclusion or omission, might be misleading to the Court.

The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.