**MINNESOTA MINING AND MANU-FACTURING COMPANY and Imation Corp., Plaintiffs,**

v.

**APPLETON PAPERS INC., Defendant.**

**Civil No. 4–95–786(DSD/RLE).**

United States District Court,
D. Minnesota.

Feb. 16, 1999.

Susan C. Laine, Peggy Kubicz Hall, Carolyn A. Bates, Joseph Henry Otterstetter, 3M Company, St. Paul, MN, Frank P. Porcelli, Alan D. Smith, Jeffrey L. Snow, Fish & Richardson, Boston, MA, Susan M. Zerull, Unknown, Ralph A. Mittelberger, Fish & Richardson, Washington, DC, Daniel R. Shulman, Shulman Walcott & Shulman, Mpls, MN, Michael Eugene Florey, Stephen Reynold Schaefer, Fish & Richardson, Mpls., MN, for Minnesota Mining and Manufacturing Company.

Daniel R Shulman, David Lawrence Shulman, Shulman Walcott & Shulman, Mpls., MN, for Imation Corp.

Keith P. Wilson, St. Paul, MN, pro se.

Kenneth J. Perrington, Cold Springs, MN, pro se.

Charles Andrew Mays, Douglas Bruce Greenswag, Harold D. Field, Jr., Robert Lee DeMay, Steven L. Belton, Keith S. Moheban, Elizabeth A Cumming, Laurie J. Dechery, Leonard Street and Deinard, Mpls, MN, William L. Greene, Greene Espel, Mpls, MN, Steven P. Petersen, William J. Birmingham, Theodore W. Anderson, Allen E. Hoover, Mark Joy, Leydig Voit & Mayer, Chicago, IL, Edwin F. Bush, II, Bush Law Office, Appleton, WI, Ben Mieliulis, for Appleton Papers, Inc.

Sandra Jean Grove, Castor Klukas Scherer & Logren, Mpls., MN, James J Dries, Dries Law Office, Brookfield, WI, April Rockstead Barker, Liebmann Conway Olejniczak & Jerry, Green Bay, WI, for Home Insurance Company.

Jerome R. Klukas, Castor Klukas Scherer & Logren, Mpls., MN, for Royal Surplus Lines Insurance Company, Royal Indemnity Company.

## ORDER

DOTY, District Judge.

This matter is before the court on (1) defendant's motion for partial summary judgment on the federal antitrust issues in this case; (2) parties' cross-motions to strike certain material submitted during the briefing of the partial summary judgment motion; (3) plaintiffs' motion for summary judgment on the infringement and public use issues; and (4) defendant's motion for summary judgment on the public use issue. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants defendant's motion for summary judgment on the public use issue and denies all other motions.

The court will address the antitrust and patent motions separately.

### I. Motions Relating to Plaintiffs' Antitrust Claims

#### A. Background to Antitrust Claims

The antitrust portion of this case involves the national market for carbonless paper sheets. Carbonless paper is the raw material for multi-part business forms and credit card charge slips. It is coated on one or both sides so that when pressure is applied to a top sheet, images are produced on the sheets laying underneath. Carbonless paper is sold in both rolls and sheets, although the market characteristics of the two vary significantly in terms of pricing, customers, distribution, uses, and manufacture. Carbonless roll products make up about 87 percent of the overall carbonless paper market in the United States. They are sold to mass-volume business form manufacturers. Carbonless sheet products make up the remaining 13 percent of the national market. They are sold to fine paper merchants for resale to thousands of "sheet printers," who use lower volume presses to fill smaller orders.

In 1954, the NCR Corporation invented carbonless paper and introduced it to the U.S. market under the trademark "NCR Paper." Appleton Papers Inc. ("Appleton") was spun off from NCR in 1978 and continues to sell the NCR Paper brand of carbonless paper. The manufacture and marketing of carbonless paper, in both roll and sheet form, remains Appleton's primary line of business. Minnesota Mining and Manufacturing Company ("3M") began producing carbonless sheets in the 1970s, although it did not enter the market for carbonless rolls. In July 1996, 3M's carbonless paper division was spun off into the newly created Imation Corporation. Imation continues to sell carbonless sheet products. For convenience, the court will collectively refer to 3M and Imation as "3M."

Largely because of the emergence of non-impact printing, the carbonless sheet market is currently in decline. It is also highly concentrated. Since 1989, only four firms have competed for market share: Appleton, 3M, Mead, and Nashua. During this period, Appleton's aggregate nationwide share has gone from 50 percent to 67 percent, while 3M's share has declined from 26 percent to 13 percent. 3M alleges that Appleton's increasingly dominant position in the market since 1989 is the result of Appleton's new corporate strategy of forming sole-source relationships with paper merchants. By saturating local markets with these agreements, 3M claims, Appleton has increased its market share by blocking its rivals' avenues of distribution. While freely acknowledging that it

has adopted the goal of becoming the largest supplier in a declining market, Appleton insists that its rising market share is the result of superior products and greater efficiency, not anticompetitive tactics.

On September 29, 1995, 3M filed a complaint against Appleton in federal district court, claiming patent infringement. On November 3, 1995, 3M amended its complaint to add federal antitrust and state common law claims. Now Appleton moves for partial summary judgment on 3M's federal antitrust claims. The parties have also brought cross-motions to strike materials submitted during the briefing of the antitrust motion.

### B. Motions to Strike

To begin, the court will address the parties' cross-motions to strike. Appleton moves to strike the affidavit of David L. Shulman, which disputes, paragraph by paragraph, the factual accuracy of many of the contentions made by Appleton in its initial summary judgment brief. Appleton argues that this affidavit is supplemental lawyer's argument that violates (1) Local Rule 7.1(c), which provides that parties must keep their memoranda within 35 pages, and (2) Federal Rule of Civil Procedure 56(e), which requires that any affidavit opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated herein." 3M responds that the Local Rules explicitly permit affidavit and that, consistent with Rule 56(e), Shulman's affidavit statements were made on his personal knowledge, after carefully reviewing both Appleton's memorandum and the evidentiary record.

Although Appleton makes a good argument that 3M has violated the spirit, if not the letter, of these rules, the court will not strike the affidavit. First, the record evidence in this case is unusually voluminous and it is understandable that a party opposing summary judgment would want to ensure that the court does not lose track of what facts are contested and what are not. Second, any legal arguments contained in the affidavit appear to replicate arguments already contained in 3M's response memorandum.

The court will also deny 3M's motion to strike certain statements contained in Appleton's reply memorandum and Catharine Lawton's Second Affidavit, for reasons to be explained in Parts I.C.2 and I.C.5 below.

### C. Appleton's Partial Motion for Summary Judgment on 3M's Antitrust Claims

#### 1. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). A fact is material only when its resolution affects the outcome of the case. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *See id.* at 252, 106 S.Ct. 2505.

On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id.* at 250, 106 S.Ct. 2505. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id.* at 322–23, 106 S.Ct. 2548.

#### 2. Definition of the Relevant Market

■ There is a threshold dispute between the parties as to how the relevant market should be defined for purposes of summary judgment. In antitrust cases involving exclusive dealing arrangements, a court must ini-

tially determine "the line of commerce" and "the area of effective competition in the known line of commerce." *See Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). The parties agree that the line of commerce at issue in this case is the market for carbonless paper sheets. They disagree, though, over how the geographic market should be defined.

To summarize the conflict: During the pretrial phase of the litigation, 3M adopted varying definitions of the geographic market, ranging from "the United States," as described in its first amended complaint, to a nationwide "aggregation" of local markets, as described at later points in the litigation. Faced with this inconsistency, Appleton stated the following in its initial summary judgment brief:

> While Appleton does not consent to try claims inconsistent with 3M's pleading, it will not challenge 3M's or its expert's market definitions for purposes of this motion. Appleton will also assume that [3M's expert] is accurate in concluding that demand in the relevant market(s) is steadily declining and that, due to the decline and high capital costs, there will be no future entry. Appleton's motion further assumes the existence of issues of fact as to whether Appleton has market power in the relevant market(s) and has demonstrated an intent to exclude competitors.

Appleton Partial Summary Judgment Memo. at 2–3. In its response brief, 3M continued to refer to both national and local markets, stating that under any definition Appleton possesses market power. In its reply memorandum, however, Appleton asserted that by not specifying the relevant market in its response brief, 3M had failed to establish a prima facie element of each of its antitrust claims. 3M now brings a motion to strike the portion of Appleton's reply brief in which this assertion is made.

As stated, the court will not grant 3M's motion to strike. In fact, it shares some of Appleton's frustration with 3M's shifting market definition. At the same time, however, er, the court will not accept Appleton's invitation to dispose of 3M's antitrust claims based on its alleged failure to define the relevant market. In its initial brief, Appleton stated, unequivocally, that for purposes of summary judgment, it would assume "the existence of issues of fact as to whether Appleton has market power in the relevant market(s)." Having conceded the issue of market power for purposes of its motion, Appleton cannot now claim that 3M has failed to make out its prima facie case.

For purposes of this motion, the court will assume that the relevant geographic market is the entire United States. Not only does 3M's complaint indicate that the scope of its claim is national, most of the evidence in the record and the arguments in 3M's response memorandum direct the court toward considering the national market as a whole.[1]

### 3. Exclusive Dealing Claims

 Appleton seeks summary judgment on 3M's claim that Appleton's sole sourcing policy is a form of exclusive dealing that violates § 3 of the Clayton Act and § 1 of the Sherman Act.[2] Section 3 of the Clayton Act provides:

> It shall be unlawful for any person ... to lease or make a sale or contract for sale of goods ... on the condition, agreement, or understanding that the lessee or purchaser shall not use or deal in the goods ... of a competitor ... of the lessor or seller ... where the effect may be to substantially lessen competition or tend to create a monopoly.

Exclusive dealing arrangements raise antitrust concerns insofar as they operate to foreclose "competition in the covered portion of the relevant market during the term of the agreement." *Omega Environmental, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157 (9th Cir.1997). However, because these arrangements often have procompetitive effects, *id.; Ryko Man-*

---

1. The court strongly suggests that 3M settle on a geographic definition quickly. It will not be permitted to waffle on market definition at trial.

2. The parties apparently agree that analysis under § 1 of the Sherman Act should track the

analysis under § 3 of the Clayton Act. Below, the court addresses whether a claim under § 2 of the Sherman Act is similarly subsumed by the Clayton Act analysis.

ufacturing Co. v. Eden Services, 823 F.2d 1215, 1235 n. 17 (8th Cir.1987), the Supreme Court has instructed that exclusive dealing "does not violate [§ 3 of the Clayton Act] unless the court ... believes it will foreclose competition in a substantial share of the line of commerce affected." *Tampa Electric*, 365 U.S. at 327, 81 S.Ct. 623. As more recently articulated:

> In determining whether an exclusive dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question—the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984) (O'Connor, J., concurring).

In *Ryko*, the Eighth Circuit outlined the procedure for evaluating whether an exclusive dealing arrangement has frozen out an unacceptably high portion of the competition:

> Where the degree of foreclosure caused by the exclusivity provisions is so great that it invariably indicates that the supplier imposing the provisions has substantial market power, we may rely on the foreclosure rate alone to establish the violation. However, where ... the foreclosure rate is neither substantial nor even apparent, the plaintiff must demonstrate that other factors in the market exacerbate the detrimental effect of the challenged restraints.

823 F.2d at 1235. Thus, *Ryko* contemplates a two-step process. First, the court must determine the baseline foreclosure rate. Generally speaking, a foreclosure rate of at least 30 percent to 40 percent must be found to support a violation of the antitrust laws. *See United States v. Microsoft*, 1998–2 Trade Cases ¶ 72261 (CCH), 1998 WL 614485 at *19 (D.D.C. Sept.14, 1998) (citing cases and stating that "plaintiffs must establish foreclosure on the order of greater than 40 percent to prevail on their exclusive dealing claims"); ABA Section of Antitrust Law, Antitrust Law Developments 222–23 (4th ed.1997) (stating that "judicial decisions have estab-

lished a virtual safe harbor for market foreclosure of 20 percent or less" and noting that the current trend is toward even "higher market thresholds as a prerequisite to finding exclusive dealing unlawful"). Second, unless the foreclosure rate is so great that it "invariably indicates" that competitors are frozen out of the relevant market, the court must weigh a number of other factors in measuring the actual anticompetitive effect of the exclusivity arrangements. Perhaps most important among the factors is the duration and terminability of the arrangement: the shorter an agreement's term and the easier it is to terminate, the more likely that it will be upheld. *See In re Beltone Electronics Corp.*, 100 F.T.C. 68, 210 (1982); *Gilbarco*, 127 F.3d at 1163; *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir.1983). In fact, courts increasingly view at-will exclusive arrangements as presumptively valid. *See Roland Mach. Co. v. Dresser Indus.*, 749 F.2d 380, 395 (1984), cited in *Gilbarco*, 127 F.3d at 1163.

*Ryko* also instructs that the following factors should be considered in gauging whether an exclusive dealing restraint " 'has a probable adverse effect on interbrand competition' ":

> the willingness of consumers to comparison shop and their loyalty to existing distributors; the existence of entry barriers to new distributors; the availability of alternative methods of distribution; and any trend toward growth (or decline) in the level of competition at the supplier level.

823 F.2d at 1234 (quoting *Beltone*, 100 FTC at 208). In addition to these specific factors, courts will also examine procompetitive effects that may justify exclusive dealing agreements in the relevant market, consistent with the rule of reason analysis conducted in other antitrust settings. *See Tampa Electric*, 365 U.S. at 334, 81 S.Ct. 623; *Roland Mach. Co.*, 749 F.2d at 395–96.

In the present case, Appleton contends that 3M has failed under the foregoing framework to show a substantial foreclosure of the carbonless sheet market caused by Appleton's exclusive dealing arrangements with distributors. Appleton concedes, for purposes of this motion, that it currently possesses market power on the order of two-

thirds of the carbonless sheet market. Further, Appleton's own marketing analysis states that, within this market, there is a "nearly precise correlation between distribution coverage/share and manufacturer/brand market share." *See* Appleton Memo, Carbonless Sheets Marketing, at 2. Nevertheless, Appleton insists that its sole-sourcing agreements with carbonless sheet distributors freeze out nobody. Rather, Appleton argues, because these agreements are terminable at will, 3M (or any other competitor) is free to attempt to convert exclusive Appleton distributors to non-Appleton carbonless sheets whenever it chooses.

However, there are genuine issues of fact as to whether Appleton's agreements are actually terminable at will. When ascertaining the characteristics of an exclusive dealing arrangement, courts look to the "practical effect" of the agreement, not merely to its form. *Tampa Electric*, 365 U.S. at 328, 81 S.Ct. 623; *see also Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 466–67, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.' "). Here, 3M has produced evidence that Appleton's sole-sourcing agreements often include incentives that have the practical effect of tying up the paper sheet inventory of a merchant over a period of several years. 3M also points to unique distribution factors, like the high costs a paper merchant must incur to switch completely from one brand to another, that make it very difficult for a supplier to dislodge a competitive brand from an exclusively dealing merchant. Further, 3M asserts that Appleton's high market share and the deeply rooted customer preference for the NCR brand of paper prevent merchants from surrendering Appleton as a supplier, which they must do under these agreements if they desire to distribute non-Appleton brands. Finally, 3M contends that, at the

instance of Appleton, major distributors have agreed among themselves that they will remain loyal to Appleton carbonless sheets regardless of competitors' pricing or product innovations. While Appleton sharply disputes most of these allegations, 3M has produced sufficient evidence to create a fact question as to whether Appleton's sole-source arrangements are truly terminable at will.

Regardless of whether its exclusive dealing arrangements are construed as at-will or not, Appleton argues that they benefit competition in the carbonless sheet market. In support of this contention, Appleton relies on the widely accepted principle that exclusive dealing "may be beneficial by focusing the distributor's efforts on one product line and, in turn, removing the 'free rider' threat to the manufacturer's own selling efforts." *Ryko*, 823 F.2d at 1235 n. 17. Consistent with this theory, Appleton has shown that, in the past, some dual-source paper merchants have acted as mere "order takers" who avoid trying to convert customers to a different brand.

As 3M points out, however, the procompetitive justification for exclusive dealing arrangements can be extended only so far: when these arrangements serve to freeze otherwise viable brands out of the market, the competitive benefit of focusing distributors' efforts on one product is lost. This is why the *Ryko* court identified specific factors for measuring whether exclusive dealing arrangements help or hinder competition in a particular market. Under each of these factors, 3M has produced substantial evidence that the market for carbonless sheets is vulnerable to foreclosure. First, 3M has shown that because of one-stop convenience and special credit arrangements, most printers remain loyal to their distributors and do not comparison shop. Second, 3M has demonstrated that because of a strong trend toward consolidation at the merchant level, entry barriers at the distribution level are likely to be high. Third, 3M has created a fact issue as to whether there are practicable alternative methods of distribution for carbonless sheets beside paper merchants.[3] Fourth, it

---

**3.** Because of the high correlation between distribution and overall market share in the carbonless sheet market, the following observation in *Ryko* may not be applicable to this case:

Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of "substantial foreclosure," because it is

is virtually undisputed that: (1) consumer demand for carbonless sheets is declining, (2) the possibility of future entry by other suppliers is low, and (3) Appleton's market share is rapidly on the rise.

In sum, Appleton contends that its emergence as the dominant player in the declining carbonless sheet market is the result of its superior efficiency and product quality, and that it should not be punished for its success. However, 3M has brought forward substantial evidence that Appleton may have succeeded by improperly shutting out the competition. Accordingly, 3M's claims under § 3 of the Clayton Act and § 1 of the Sherman Act are not amenable to summary judgment.

**4. Claims under § 2 of the Sherman Act**

Appleton also seeks summary judgment on the claims that 3M has brought under § 2 of the Sherman Act. At the outset, Appleton argues that any § 2 claim involving exclusive dealing should be collapsed into the analytical framework discussed above. The court does not agree. In *Tampa Electric*, the Supreme Court stated that when an exclusive dealing contract "does not fall within the broader proscriptions of § 3 of the Clayton Act it follows that it is not forbidden by [§§ 1 and 2 of the Sherman Act]." However, in *Tampa Electric* there was no indication that the defendant's allegedly unlawful behavior involved more than an exclusive dealing contract. Further, there was no explicit finding that the defendant possessed market power. Here, in contrast, 3M has alleged both that Appleton possesses market power and that its sole-source strategy is one part of a pattern of predatory conduct. Viewed from the perspective of § 2 precedent, therefore, 3M's claims are similar to those addressed in refusal-to-deal cases like *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) and *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951). *See* Phillip E. Areeda et al., Antitrust Law ¶ 768e6 (equating "[e]xtraction of an agreement not to deal with any competitor" with "refusing to deal with buyers who do"). Thus, without speculating as to whether, in the context of this case, § 3 of the Clayton

less clear that a restraint involving a distributor will have a corresponding impact on the level of competition in the consumer market.

Act proscribes more or less anticompetitive conduct than § 2 of the Sherman Act, the court will consider 3M's § 2 claims on their own terms. *See Pepsico, Inc. v. The Coca-Cola Co.*, 1998–2 Trade Cases ¶ 72257 (CCH), 1998 WL 547088 (S.D.N.Y. August 27, 1998) (denying motion to dismiss where plaintiff brings § 2 claim against defendant based on defendant's at-will exclusive dealing arrangement with distributor); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 803 (8th Cir.1987) (affirming jury determination that defendant had violated § 2 by, inter alia, attempting to procure an exclusive dealing arrangement).

■ To prevail on a § 2 claim, 3M must prove: (1) Appleton's possession of monopoly power in the carbonless sheet market and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Because Appleton has conceded for purposes of this motion that it possesses market power in the carbonless sheet market, the court will focus on whether plaintiff has demonstrated a genuine factual issue as to Appleton's "willful acquisition or maintenance of that power."

The Supreme Court has defined unlawful conduct under § 2 in the following way:

The question whether [a defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [a plaintiff]. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been "attempting to exclude rivals on some basis other than efficiency," it is fair to characterize its behavior as predatory.

*Aspen Skiing*, 472 U.S. at 605, 105 S.Ct. 2847. The Eighth Circuit has also adopted a definition for unlawful conduct: "To be labeled anti-competitive, the conduct involved must be such that its 'anticipated benefits

823 F.2d at 1235.

were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.' " *Hartz*, 810 F.2d at 803 (quoting *Trace X Chemical, Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir.1984)).

■ Applying these standards to the current record, the court concludes that a genuine question exists as to whether Appleton acted to exclude its rivals in the carbonless sheet market on some basis other than efficiency. There is substantial evidence suggesting that Appleton has engaged in the following conduct: creating and enforcing sole-sourcing agreements having the effect of closing distribution channels to its rivals; paying merchants not to deal with competitors; starting rumors regarding the viability of 3M's carbonless paper business; attempting to buy rival carbonless paper manufacturers. On similar facts in *Hartz*, the Eighth Circuit upheld a jury finding that the defendant had violated § 2:

> The jury could reasonably find that Hartz's activities did not tend to allow products to compete against each other on their own terms, but rather that Hartz invoked its considerable market power to cause superior competing products to fail to reach retail shelves, preempting any opportunity for the consumer to make a real choice.

810 F.2d at 803–04. Moreover, Appleton has conceded that there is a fact issue as to its specific intent to exclude competitors from the market. As the Supreme Court stated in *Aspen Skiing*, "evidence of intent is . . . relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.' " 472 U.S. at 602, 105 S.Ct. 2847. Considering the evidence as a whole, then, a jury might reasonably conclude that Appleton (1) possesses monopoly power and (2) has deliberately acted to exclude 3M and other rivals from the market.

■ For similar reasons, the court concludes that 3M's attempted monopolization claim must also survive summary judgment. To prevail on an unlawful attempt claim under § 2, a plaintiff must prove "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Hartz*, 810 F.2d at 801. First, Appleton concedes the specific intent element for purposes of summary judgment. Second, the court has already found that a genuine fact issue exists as to the lawfulness of Appleton's conduct and purpose. Third, the Supreme Court has stated that "to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993); *Hartz*, 810 F.2d at 804. Proof of "market power" in a monopolization claim and proof of "dangerous probability of success" in an attempt claim attempt are "of the same character." *See McGahee v. Northern Propane Gas Co.*, 858 F.2d 1487, 1505 (11th Cir.1988). Thus, Appleton's concession on the issue of market power means that there is a fact question as to whether any attempt to monopolize would have a dangerous probability of success. Accordingly, both § 2 claims are properly left for the jury.

### 5. Antitrust Standing and Antitrust Injury

■ Appleton also challenges 3M's ability to bring this suit on the ground that 3M can show neither antitrust injury nor antitrust standing. To prevail on its antitrust claims, 3M must prove injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [Appleton's] acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). When evaluating the related issue of a private plaintiff's antitrust standing, a court considers a number of factors:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the

injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.

*McDonald v. Johnson & Johnson,* 722 F.2d 1370, 1374 (8th Cir.1983). However, the frequently dispositive threshold consideration is whether the plaintiff has suffered antitrust injury. *See Midwest Communications, Inc. v. Minnesota Twins, Inc.,* 779 F.2d 444, 450 (8th Cir.1985) (citing *Brunswick Corp.,* 429 U.S. at 489, 97 S.Ct. 690). Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury and possess antitrust standing to sue for redress of this injury. *See* Areeda & Hovencamp, Antitrust Law, ¶ 373d1, at 278 (1995) ("Standing is clear and seldom challenged when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market of the plaintiff ... so that the defendant could maintain or create a monopoly"); *Amarel v. Connell,* 102 F.3d 1494, 1509 (9th Cir.1996) ("[W]hen defendants engage in ... anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market is the party with standing.").

Appleton nonetheless argues that 3M has failed to show that any of Appleton's allegedly unlawful activities have artificially raised the price of carbonless sheets. In its reply memorandum, Appleton attacks the validity of the findings of 3M's economic expert, William S. Comaner, relying on a second affidavit by its own expert, Catharine M. Lawton. 3M, in turn, moves the court to strike this affidavit, claiming that it contradicts the earlier representations made by Lawton when she was deposed by 3M. As stated, the court will not grant the motion to strike. Since filing the motion to strike, 3M has had the opportunity to depose Lawton on the issues raised in her late-filed affidavit, and the transcript of that deposition is now lodged in the record. Regardless, this episode only underscores what is clear from the record evidence in this case: the existence of antitrust injury, like the existence of antitrust violation, is a hotly disputed issue of fact. As a consequence, summary judgment cannot be granted.

## II. Motions Related to Patent Issues

### A. Background to the Patent Dispute

The patent dispute in this case arises out of the following events: In the spring of 1989, inventors Kenneth Perrington and Robert Kampfer devised a method for perforating carbonless paper with a laser. With the help of Thomas Hunter, a 3M employee supervising in-plant printing operations, Perrington devised a pilot program for the manufacture and distribution of laser-perforated forms. Perrington supplied approximately 30,000 laser-perforated sheets of carbonless paper for use in preparing 10,000 sets of Form 7676E, a standard form used throughout the 3M organization. 3M's in-plant print shop placed the 7676E imprint on the laser-perforated sheets, which were then assembled into pads consisting of more than 10,000 form sets. The sample forms were then shipped to 3M's central distribution center to be circulated throughout the company when ordered by 3M employees. The employees would not know that the forms were made using a new process. Beginning in July 1989, and for up to six weeks afterward, the sample forms were distributed throughout 3M, for use by potentially thousands of 3M employees. Although he avers that his goal in disseminating the forms was to receive feedback from 3M employees regarding the performance of the laser-perforated forms, Perrington did not keep any records of where the forms were distributed or what any specific end user thought of the form. Perrington does claim to have inquired as to whether there were any complaints about the product.

On August 17, 1990, 3M filed a patent application for a laser-perforation process to be used in making carbonless paper. Continuation applications were filed on August 16, 1991 and June 23, 1994. In October 1991, 3M launched its laser-perforated carbonless paper product, marketed as "Scotchmark Laser Pre–Perfed." In February 1993, Appleton launched its own brand of pre-perforated carbonless paper. On August 22, 1995, 3M was issued United States Patent No. 5,444,-035 ("the '035 patent").

3M's infringement suit followed, with Appleton raising invalidity defenses. On Sep-

tember 12, 1996, District Court Judge John Tunheim issued an order denying 3M's motion for a preliminary injunction. After an extended period of discovery, the parties have now brought cross-motions for summary judgment on the patent issues in this case.

### B. Cross–Motions on the Issue of Public Use

Appleton contends that the '035 patent owned by 3M is invalid because "the invention was . . . in public use . . . more than one year prior to the date of the application for patent." 35 U.S.C. § 102(b). The Federal Circuit has repeatedly defined " 'public use' as including 'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.' " *Baxter International, Inc. v. Cobe Labs., Inc.*, 88 F.3d 1054, 1058 (Fed.Cir.1996) and *Lough v. Brunswick Corp.*, 86 F.3d 1113, 1119 (Fed. Cir.1996) (both cases quoting *In re Smith*, 714 F.2d 1127, 1134 (Fed.Cir.1983)). If a challenging party makes a prima facie showing of public use, "[a] patentee may negate a showing of public use by coming forward with evidence that its use of the invention was experimental." *Lough*, 86 F.3d at 1120.

Both public use and experimental use are questions of law, *see id.*, although the challenging party must prove subsidiary questions of fact by clear and convincing evidence. *See Tone Bros. v. Sysco Corp.*, 28 F.3d 1192, 1197 (Fed.Cir.1994). Regarding these issues of fact, in the context of summary judgment, the moving party must meet the standards stated in Part I.B above. 3M does not dispute, however, that 10,000 sample form sets embodying the '035 patent were distributed to an unknown number of end users throughout the company via the standard in-house ordering process. 3M also does not dispute that the earliest arguable date of filing for the '035 patent was August 17, 1990, more than one year after this large-scale distribution in July of 1989. Instead, 3M contends that when an invention is distributed to employees within the confines of the patentee company, that use is nonpublic as a matter of law.

The court cannot accept this constricted interpretation of § 102(b). In *Egbert v.*

*Lippmann,* the Supreme Court discussed the broad scope of the public use bar:

> We observe, in the first place, that to constitute the public use of an invention it is not necessary that more than one of the patented articles should be publicly used. . . .

> We remark, secondly, that, whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his device, gives or sells it to another . . . without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person.

> We say, thirdly, that some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye. . . . Nevertheless, if its inventor sells a machine which his invention forms a part, and allows it to be used without restriction of any kind, the use is a public one.

104 U.S. 333, 336, 26 L.Ed. 755 (1881). Under *Egbert*, then, a single use of an invention by a single third party, even though the invention is not discernable to the unpracticed eye, will be a public use unless the inventor exercises adequate control over that use by the third party. In *Baxter International, Inc. v. Cobe Labs., Inc.*, a recent case involving the use of a centrifuge by an NIH researcher in his personal laboratory, the Federal Circuit demonstrated the continued vitality of the *Egbert* approach: The researcher's "lack of effort to maintain the centrifuge as confidential coupled with the free flow into his laboratory of people, including visitors to NIH, who observed the centrifuge in operation and who were under no duty of confidentiality supports only one conclusion: that the centrifuge was in public use." 88 F.3d at 1058. Likewise, in *Beachcombers, International Inc. v. WildeWood Creative Prods. Inc.*, 31 F.3d 1154 (Fed.Cir. 1994), the court found a public use where a designer demonstrated a kaleidoscope invention to twenty or so guests during a private party at her home. The court explained that the inventor "did not retain control over the

use of the device and the future dissemination of information about it." *Id.* at 1160. *See also Electric Storage Battery Co. v. Shimadzu,* 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939) ("[Public use is] the ordinary use of a machine or the practice of a process ... in the usual course of producing articles for commercial purposes."); *Lough,* 86 F.3d at 1122 ("[T]hose to whom [the inventor] gave the prototypes constituted 'the public,' in the absence of meaningful evidence of the experimentation."); *Moleculon Research Corp., v. CBS, Inc.,* 793 F.2d 1261, 1266 (Fed.Cir.1986) (holding that inventor did not place puzzle device in public use when he showed invention to co-workers because "the personal relationships and surrounding circumstances [indicate that the inventor] at all times retained control over the puzzle's use and the distribution of information concerning it"); *Gennodie v. Metro N. Commuter R.R.,* 37 U.S.P.Q.2d 1263 (S.D.N.Y.1995) (finding public use when company used railroad equipment prototypes in the ordinary course of business, even though that use was outside the view of the general public).

Instructed by these cases, the court concludes that Appleton has made a prima facie showing of public use. Over a span of several weeks, thousands of the sample forms were distributed to an unknown number of employees throughout the 3M corporation. During this period, the inventors exercised no control over where the forms were sent, who received them, or how they were used. While 3M argues that employees who received the forms owed a duty not to disclose confidential business information, there is no indication in the record that any employee would have understood the use and circulation of the form to be a confidential matter. The forms were not denominated as confidential. No 3M employee was asked to sign a secrecy agreement before using them. And 3M announced no special company-wide policy regarding their use or circulation. All 3M can show is that the form selected to

embody the '035 patent was described as an "inter-office communication memo" in a 3M office product catalog. However, at least one 3M employee, a customer services manager, frequently used the 7676E form to communicate with parties outside the company. In short, 3M employees were free to use the sample forms however they wanted in the ordinary course of business, which would almost inevitably include contact with parties outside the company.[4] These undisputed facts easily establish a prima facie case of public use.

3M may negate this showing of public use by coming forward with convincing evidence that its activities prior to the critical date were experimental. *Lough,* 86 F.3d 1113, 1120; *TP Labs. v. Professional Positioners, Inc.,* 724 F.2d 965, 971 (Fed.Cir.1984) (also pointing out that the ultimate burden of proof remains with the party challenging the patent). A court's analysis of a purported experimental use requires consideration of the totality of the circumstances and the policies underlying the patent bar. *See Baxter,* 88 F.3d 1054. Because "the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value," *TP Labs.,* 724 F.2d at 972, the Federal Circuit has identified a number of "objective indicia of experimentation": the number of prototypes and the duration of the testing; the degree of secrecy existing between patentee and the party carrying out the experiment; the amount of compensation received by the patentee; and the degree of control the inventor maintained over the testing. *See Lough,* 86 F.3d at 1120. In *Lough,* the court emphasized that the "last factor of control is critically important, because, if the inventor has no control over the alleged experiments, he is not experimenting. If he does not inquire about the testing or receive reports concerning the results, similarly, he is not experimenting." *Id.* Further, testing proto-

---

4. 3M places great emphasis on the fact that, after months of discovery, Appleton has been unable to locate a single form from the relevant 1989 print run that actually made it outside the company. Yet this fact is important only if the court accepts the premise that, in order to constitute a public use, the invention must have physically fallen into the hands of someone who works

outside 3M. As discussed above, the court rejects this novel and unduly narrow conceptualization of "public use." Indeed, the fact that during discovery Appleton and 3M were unable to locate a single specimen of the thousands of distributed sample forms, even within 3M files, demonstrates how unrestricted their 1989 dissemination really was.

col is expected to be especially formal when a large company conducts the experiment. *See id.* at 1120–21; *id.* at 1123 (Plager, J., dissenting) ("We could expect the combination of engineering and legal staffs [at large corporations] to be punctilious about observing the niceties of our prior opinions on how to conduct experiments so as to avoid any possible running afoul of the public use bar.").

Here, 3M has produced no evidence that the inventors of the '035 patent exercised any experimental control whatsoever over the 1989 form set distribution.[5] Over 10,000 sample forms were widely distributed throughout the organization without regard to who received them or how they were used. The inventors never sought specific feedback from the end users or received reports concerning the results of their alleged test. In fact, the inventors cannot identify a single end user who actually received a sample form. On similar facts in *Lough,* where an individual inventor distributed prototypes of his invention to six friends and then failed to follow up with inquiries or keep records of the experiment, the Federal Circuit reversed an infringement verdict by the district court below and granted the defendant judgment as a matter of law: "When one distributes his invention to members of the public under circumstances that evidence a near total disregard for supervision and control concerning its use, the absence of these minimal indicia of experimentation require a conclusion that the invention was in public use." *Id.* at 1122. The conclusion in *Lough* applies with equal force to the facts of this case.

Finally, the court must consider "how the totality of the circumstances of the case comports with the policies underlying the patent use bar." *Tone Bros.,* 28 F.3d at 1198, *quoted in Baxter,* 88 F.3d at 1058, and *Lough,* 86 F.3d at 1119. Among these policies are: (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3)

allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of the patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

*Id.* In the present case, 3M contends that the in-company distribution of an invention, whether performed as part of a valid experiment or not, is not a public use. If the court were to read a safe-harbor provision of this kind into § 102(b), however, it would undermine at least three of the policies stated above. First, it would discourage prompt and widespread disclosure of inventions. Second, it would unreasonably extend the period of time an inventor has to assess the economic viability of pursuing a particular patent. The Federal Circuit has already spoken on this issue:

> The experimental use doctrine operates in the inventor's favor to allow *the inventor* to refine his invention or to assess its value relative to the time and expense of prosecuting a patent application. If it is not the inventor or someone under his control or 'surveillance' who does these things, there appears to us no reason why he should be entitled to rely on them to avoid the statute.

*In re Hamilton,* 882 F.2d 1576, 1581 (Fed. Cir.1989) (emphasis in the original). Third, adopting 3M's proposed public use exception for in-house distribution would grant a significant commercial advantage to companies whose employees are able stand in for an invention's potential consumers. Here, for example, 3M's large-scale, unmonitored distribution of sample forms could not have produced useful technical data. However, it may well have produced useful marketing information, particularly regarding the level of consumer demand and acceptance. *See* Perrington Depo. at 703 ('035 patent co-inventor stating that even prior to the distribution of samples he was convinced that the

---

**5.** In fact, even if the court were to consider evidence of the subjective intentions of the inventors in this case, much of it would support the finding that the decision to disseminate forms throughout the company was for a purpose other than experimental validation. For example, even

before the distribution of the sample form sets, Perrington told 3M management that he was "convinced ... that we had all the necessary information" about the invention's technical feasibility. Perrington Depo. at 703.

invention "*was* technically feasible. It definitely *appeared* to be market feasible." (emphasis added)). Addressing precisely this point, the Federal Circuit has stated that "[t]he experimental use exception ... does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention. The purpose of such activities is commercial exploitation and not experimentation." *In re Smith,* 714 F.2d 1127, 1134 (Fed.Cir.1983).

In sum, Appleton has forcefully demonstrated, on the undisputed evidence, that the '035 patent was in public, nonexperimental use more than a year before the patent application was filed. When the totality of the circumstances is viewed in light of the policies underlying the public use bar, the court can reach no other conclusion but that the '035 patent is invalid. Accordingly, the court need not address 3M's motion on the issue of infringement.

### CONCLUSION

Based on the foregoing discussion, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for partial summary judgment on the antitrust issues (Doc. No. 167) is denied;

2. Defendant's motion to strike (Doc. No. 190) is denied;

3. Plaintiffs' motion to strike (Doc. No. 197) is denied;

4. Defendant's motion for summary judgment on the issue of public use (Doc. No. 161) is granted;

5. Plaintiffs' motion for summary judgment on the issues of infringement and public use (Doc. No. 156) is denied.